

1 | R. Martin Palmer
Law Offices of Martin Palmer
2 | 21 Summit Avenue
Hagerstown, MD 21740
3 | (301) 790-0640
(301) 790-0684 (Facsimile)
4 | info@martinpalmer.com
Attorney for Plaintiffs
5 |

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORN.
**EASTERN DIVISION**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

MARY SCOTT DOE, a human embryo "born" in the United States (and subsequently frozen in which state of cryo-preservation her life is presently suspended), individually and on behalf of all other frozen human embryos similarly situated; and the NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF PREBORN CHILDREN (NAAPC), PETER MURRAY and SUZANNE MURRAY, COURTNEY ATNIP and TIM ATNIP, STEVEN B. JOHNSON and KATE ELIZABETH JOHNSON, and CARA VEST and GREGORY VEST,

        Plaintiffs,

v.

ROBERT KLEIN, II, Chairman; EDWARD PENHOET, Ph.D., Vice Chairman; DAVID BALTIMORE, Ph.D.; ROBERT BIRGENEAU, Ph.D.; KEITH L. BLACK, M.D.; SUSAN V. BRYANT, Ph.D.; MICHAEL A. FRIEDMAN, M.D.; MICHAEL GOLDBERG; BRIAN E. HENDERSON, M.D.; EDWARD W. HOLMES, M.D.; DAVID A. KESSLER, M.D.; SHERRY LANSING; GERALD S. LEVEY, M.D.; TED W. LOVE, M.D.; RICHARD A. MURPHY, Ph.D.; TINA S. NOVA, Ph.D.; PHILLIP A. PIZZO, M.D.; CLAIRE POMEROY, M.D.; PHYLLIS PRECIADO, M.D.; FRANCISCO J. PRIETO, M.D.; JOHN C. REED, M.D.; JOAN SAMUELSON; DAVID SERRANO SEWELL; JEFF SHEEHY; JONATHAN SHESTACK; OSWALD STEWARD, Ph.D.; LEON J. THAL, M.D.; GAYLE WILSON; JANET S. WRIGHT, M.D., in their official capacities as members of the INDEPENDENT CITIZEN'S OVERSIGHT COMMITTEE, the governing body for the CALIFORNIA INSTITUTE FOR REGENERATIVE MEDICINE, an agency of the California state government; and ZACH W. HALL, in his official capacity as the interim president of the CALIFORNIA INSTITUTE FOR REGENERATIVE MEDICINE; and PHILLIP ANGELIDES, State Treasurer, STEVE WESTLY, State Controller, TOM CAMPBELL, Director of Finance, ROBERT KLEIN II, MICHAEL A. FRIEDMAN, M.D., and TED W. LOVE, M.D., in their official capacities as members of the CALIFORNIA STEM CELL RESEARCH AND CURES FINANCE COMMITTEE,

        Defendants,

Case No.:
ED CV 05 - 00438

FIRST
AMENDED
COMPLAINT

1          FIRST AMENDED COMPLAINT

Plaintiffs, by way of complaint against the Defendants, allege the following:

## NATURE OF ACTION

1.  This is an action for declaratory, injunctive and other necessary and appropriate relief, brought under the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., seeking (a) the entry of a declaratory judgment that (i) Plaintiff Mary Scott Doe, a human embryo and a developing human life, is a person "born" in, and a citizen of, the United States of America within the meaning of the Fourteenth Amendment and a "party" within the meaning of the Thirteenth Amendment, (ii) is entitled to due process and the equal protection of the laws and to be free from slavery and involuntary servitude, as guaranteed by the Fourteenth and Thirteenth Amendments, and (iii) that the Defendants' proposed and imminent actions of funding and otherwise facilitating, assisting or encouraging human embryo stem cell experimentation or somatic cell nuclear transfer (the methodology of cloning), which will result in her and other human embryos' certain and sudden death and destruction, will violate the due process and equal protection guarantees of the Fourteenth Amendment, and further will violate the Thirteenth Amendment's prohibition against slavery and involuntary servitude; (b) the entry of an injunction directing and ordering the Defendants to cease and desist any and all plans to fund or otherwise facilitate, assist or encourage the undertaking of any human embryo stem cell experimentation or any somatic cell nuclear transfer in violation of the Plaintiff Mary Scott Doe's and the other human embryos' federal constitutional rights; (c) the entry of a declaratory judgment that the Defendants' proposed and imminent actions of funding human embryo stem cell experimentation are preempted by federal law, specifically by Section 510 of Public Law 108-199, 118 Stat. 3, 277 (January 23, 2004); (d) the entry of a declaratory judgment that (i) Mary Scott Doe, a human embryo and a developing human life, is a member of the "people" having "by nature . . . inalienable rights" for purposes of Cal.Const. Art. I, Section 1, (ii) is a "person" entitled to due process and the equal protection

FIRST AMENDED COMPLAINT

1   of the laws as guaranteed by Cal.Const. Art. I, Section 7(a), (iii) is a party entitled

2   to be free from slavery and involuntary servitude as guaranteed by Cal.Const. Art.

3   I, Section 6, and (iv) that the Defendants' proposed and imminent actions of fund-

4   ing and otherwise facilitating, assisting or encouraging human embryo stem cell

5   experimentation or somatic cell nuclear transfer, which will result in her and other

6   human embryos' certain and sudden death and destruction, will deny Mary Scott

7   Doe's and other human embryos' inalienable rights in violation of Cal.Const. Art.

8   I, Sections 1, will deprive Mary Scott Doe and other human embryos' rights to

9   due process and the equal protection of the laws in violation of Cal. Const. Art. I,

10  §7(a), and will subject Mary Scott Doe and other human embryos to involuntary

11  servitude and slavery in violation of Cal. Const. Art. I, § 6; and (e) the entry of an

12  injunction directing and ordering the Defendants to cease and desist any and all

13  plans to fund, to finance through the issuance of bonds or to otherwise facilitate,

14  assist or encourage the undertaking of any human embryo stem cell experimenta-

15  tion or any somatic cell nuclear transfer in violation of the Plaintiff Mary Scott

16  Doe's and the other human embryos' state constitutional rights.

17

18  ### JURISDICTION AND VENUE

19  2.  Jurisdiction over this action is conferred by the federal question jurisdic-

20  tion statute, 28 U.S.C. § 1331, and by the supplemental jurisdiction statute, 28

21  U.S.C. § 1367.

22  3.  Venue is properly laid in this Court by virtue of 28 U.S.C. § 1391(b).

23

24  ### PARTIES

25  4.  Plaintiff Mary Scott Doe is a human embryo "born," i.e., produced or

26  brought into life, in one of the states of the United States, including the state of

27  California, by the new science of *in vitro* (Latin for "in glass") fertilization,

28  whereby the process of fertilization, which produces or brings her into life, takes

1  place not in a tube of flesh (the fallopian tube) but in a tube of glass (the test

2  tube), after which life for her has been presently suspended by the freezing of

3  Mary Doe in liquid nitrogen (cryo-preservation) and from which she may be

4  thawed and gently returned to the warmth of life and placed for human embryo

5  adoption so that she may fulfill her destiny as a fully developed human life or, in

6  the alternative, she may be coveted and enslaved for human embryo vivisection

7  and experimentation, resulting in her certain death and destruction.  She is "born"

8  in the United States, as that term is used in the Fourteenth Amendment to the

9  United States Constitution, specifically as the word "born" is defined in Webster's

10  Dictionary, Complete and Unabridged, of 1857, the definition contemporaneous

11  with the passage of the Fourteenth Amendment in 1868, a copy of which diction-

12  ary definition is attached hereto as Exhibit "A".

13       5.  Plaintiff National Association for the Advancement of Preborn Children

14  is an unincorporated association and organization dedicated to advocacy for the

15  equal humanity and personhood of preborn children, including "children in vitro",

16  with offices located at 21 Summit Avenue, Hagerstown, Maryland, www.naapc.org

17       6.  Plaintiffs Peter Murray and Suzanne Murray, husband and wife, are resi-

18  dents of Riverside, California, who have a baby daughter, Mary, adopted as a

19  human embryo, and who are actively considering adopting another human

20  embryo.

21       7.      Plaintiffs Tim Atnip and Courtney Atnip, husband and wife, are resi-

22  dents of Riverside, California, who have a baby son, Carter, adopted as a human

23  embryo, and who are actively considering adopting another human embryo.

24       8.  Plaintiffs Steven B. Johnson and Kate Elizabeth Johnson, husband and

25  wife, are residents of 243 Pennsylvania Avenue, Reading, Pennsylvania  19606,

26  who have a baby daughter, Zara Elizabeth, adopted as a human embryo, and who

27  are actively considering adopting another human embryo.

28

4                    FIRST AMENDED COMPLAINT

9. Plaintiffs Gregory and Cara Best, husband and wife, are residents of 16644 Mosswood Drive, Hamilton, Virginia 20158, who have a son, Jonah David, and a daughter, Gabrielle Annmarie, genetics siblings who were adopted as human embryos, and who are actively considering adopting another human embryo.

10. Defendant Robert Klein, II, on information and belief, is a resident of the state of California and is being sued in his official capacity as a duly appointed and/or elected member and the Chairman of the 29-member, Independent Citizens' Oversight Committee (hereinafter the "Committee" or the "ICOC"), which is the governing body for the California Institute for Regenerative Medicine (hereinafter "CIRM").  CIRM and its governing body, the ICOC, were created by the California Stem Cell Research and Cures Act, Cal. Health and Safety Code §§ 125290.10 et seq., which state statute was enacted on November 2, 2004, through the passage by the California electorate of the initiative measure known as Proposition 71.  Mr. Klein is also being sued in his official capacity as duly appointed and/or elected member of California Cell Research and Cures Finance Committee (hereinafter the "Finance Committee").  The Finance Committee was created by the California Stem Cell Research and Cures Bond Act of 2004, Cal. Health and Safety Code §§ 125291.10 et seq., which statute was also enacted on November 2, 2004, through the passage by the California electorate of the initiative measure known as Proposition 71.

11. Defendant Edward Penhoet, Ph.D., on information and belief, is a resident of the state of California and is being sued in his official capacity as a duly appointed and/or elected member of the ICOC.

12. Defendant David Baltimore, Ph.D., on information and belief, is a resident of the state of California and is being sued in his official capacity as a duly appointed and/or elected member of the ICOC.

13. Defendant Robert Birgeneau, Ph.D., on information and belief, is a resident of the state of California and is being sued in his official capacity as a duly

FIRST AMENDED COMPLAINT

1  appointed and/or elected member of the ICOC.

2      14.  Defendant  Keith L. Black, M.D., on information and belief, is a resi-

3  dent of the state of California and is being sued in his official capacity as a duly

4  appointed and/or elected member of the ICOC.

5      15.  Defendant Susan V. Bryant, Ph.D., on information and belief, is a resi-

6  dent of the state of California and is being sued in her official capacity as a duly

7  appointed and/or elected member of the ICOC.

8      16.  Defendant Michael A. Friedman, M.D., on information and belief, is a

9  resident of the .state of California and is being sued in his official capacity as a

10  duly appointed and/or elected member of the ICOC.

11      17.  Defendant Michael Goldberg, on information and belief, is a resident of

12  the state of California and is being sued in his official capacity as a duly appointed

13  and/or elected member of the ICOC.

14      18.  Defendant Brian E. Henderson, M.D., on information and belief, is a

15  resident of the state of California and is being sued in his official capacity as a

16  duly appointed and/or elected member of the ICOC.

17      19.  Defendant Edward W. Holmes, M.D., on information and belief, is a

18  resident of the state of California and is being sued in his official capacity as a

19  duly appointed and/or elected member of the ICOC.

20      20.  Defendant David A. Kessler, M.D., on information and belief, is a resi-

21  dent of the state of California and is being sued in his official capacity as a duly

22  appointed and/or elected member of the ICOC.

23      21.  Defendant Sherry Lansing, on information and belief, is a resident of

24  the state of California and is being sued in her official capacity as a duly appoint-

25  ed and/or elected member of the ICOC.

26      22.  Defendant Gerald S. Levey, M.D., on information and belief, is a resi-

27  dent of the state of California and is being sued in his official capacity as a duly

28  appointed and/or elected member of the ICOC.

      FIRST AMENDED COMPLAINT

1    23.  Defendant Ted W. Love, M.D., on information and belief, is a resident

2   of the state of California and is being sued in his official capacity as a duly

3   appointed and/or elected member of the ICOC.

4    24.  Defendant Richard A. Murphy, Ph.D., on information and belief, is a

5   resident of the state of California and is being sued in his official capacity as a

6   duly appointed and/or elected member of the ICOC.

7    25.  Defendant Tina S. Nova, Ph.D., on information and belief, is a resident

8   of the state of California and is being sued in her official capacity as a duly

9   appointed and/or elected member of the ICOC.

10    26.  Defendant Phillip A. Pizzo, M.D., on information and belief, is a resi-

11   dent of the state of California and is being sued in his official capacity as a duly

12   appointed and/or elected member of the ICOC.

13    27.  Defendant Claire Pomeroy, M.D., on information and belief, is a resi-

14   dent of the state of California and is being sued in her official capacity as a duly

15   appointed and/or elected member of the ICOC.

16    28.  Defendant Phyllis Preciado, M.D., on information and belief, is a resi-

17   dent of the state of California and is being sued in her official capacity as a duly

18   appointed and/or elected member of the ICOC.

19    29.  Defendant Francisco J. Prieto, M.D., on information and belief, is a res-

20   ident of the state of California and is being sued in his official capacity as a duly

21   appointed and/or elected member of the ICOC.

22    30.  Defendant John C. Reed, M.D., on information and belief, is a resident

23   of the state of California and is being sued in his official capacity as a duly

24   appointed and/or elected member of the ICOC.

25    31.  Defendant Joan Samuelson, on information and belief, is a resident of

26   the state of California and is being sued in her official capacity as a duly appoint-

27   ed and/or elected member of the ICOC.

28    32.  Defendant David Serrano Sewell, on information and belief, is a resi-

7                    FIRST AMENDED COMPLAINT

dent of the state of California and is being sued in his official capacity as a duly appointed and/or elected member of the ICOC.

33.  Defendant Jeff Sheehy, on information and belief, is a resident of the state of California and is being sued in his official capacity as a duly appointed and/or elected member of the ICOC.

34.  Defendant Jonathan Shestack, on information and belief, is a resident of the state of California and is being sued in his official capacity as a duly appointed and/or elected member of the ICOC.

35.  Defendant Oswald Steward, Ph.D., on information and belief, is a resident of the state of California and is being sued in his official capacity as a duly appointed and/or elected member of the ICOC.

36.  Defendant Leon J. Thal, M.D., on information and belief, is a resident of the state of California and is being sued in his official capacity as a duly appointed and/or elected member of the ICOC.

37.  Defendant Gayle Wilson, on information and belief, is a resident of the state of California and is being sued in her official capacity as a duly appointed and/or elected member of the ICOC.

38.  Janet S. Wright, M.D., on information and belief, is a resident of the state of California and is being sued in his official capacity as a duly appointed and/or elected member of the ICOC.

39.  Defendant Zach W. Hall, on information and belief, is a resident of the state of California and is being sued in his official capacity as the duly appointed interim president of the California Institute of Regenerative Medicine ("CIRM"), an institution and agency of the government of the State of California created by Article XXXV of the California Constitution, which Article was added to the California Constitution by an amendment adopted on November 2, 2004, through the passage by the California electorate of the initiative measure known as Proposition 71.

40. Defendant Phillip Angelides, on information and belief, is a resident of the state of California, is the Treasurer of the State of California, and is being sued in his official capacity as a duly appointed and/or elected member of the Finance Committee.

41. Defendant Steve Westly, on information and belief, is a resident of the state of California, is the State Controller for the State of California, and is being sued in his official capacity as a duly appointed and/or elected member of the Finance Committee.

42. Defendant Tom Campbell, on information and belief, is a resident of the state of California, is the Director of Finance for the State of California, and is being sued in his official capacity as a duly appointed and/or elected member of the Finance Committee.

## FACTUAL INFORMATION REGARDING THE EQUAL HUMANITY AND PERSONHOOD OF MARY SCOTT DOE

43. Mary Scott Doe is a fertilized oocyte or human embryo "produced or brought into life" by the new science of *in vitro* (Latin for "in glass") fertilization, i.e., the combining of the egg of the mother and the sperm of the father, whereby the process of fertilization, which produces or brings her into life, takes place not in a tube of flesh (the fallopian tube) but in a tube of glass (the test tube); after which, life for her has been suspended by the freezing of Mary Scott Doe in liquid nitrogen (cryo-preservation).

44. Based on a 2003 report issued by the American Society of Reproductive Medicine (ASRM), in association with The Society for Assisted Reproductive Technology (SART) and the Rand Corporation, it has been estimat-ed that there are more than 400,000 human embryos currently being held in cryo-

1   banks, much like frozen orphanages.

2       45.  The advance of technology and modern science has enabled fertiliza-

3   tion of human beings to be accomplished *in vitro*.

4       46.  The advance of technology and modern science has further enabled

5   time for the human embryo to be suspended by freezing in liquid nitrogen for

6   extended periods of time——including years.

7       47.  Subsequently, the continuum of development of the embryo may be

8   resumed and continued by gently returning the human embryo to the warmth of

9   life, upon which life for her resumes and she is allowed to fulfill her destiny.

10      48.   These procedures, when properly done, do not violate the integrity and

11  continuity of the story of life, as evidenced by the successful births of many who

12  have been preserved (frozen) as embryos, and they allow Mary Scott Doe and

13  other human embryos *in vitro* to be returned to the warmth of life, after storage for

14  months or even years in a frozen state, and to be implanted in the womb of an

15  adopting mother as a "child *in vitro*" (See sworn testimony of World Dean of

16  Geneticists and ruling of Judge Willliam Dale Young in "Tennessee Frozen

17  Human Embryo Case," Exhibit B).

18      49.  Although not every embryo that is thawed in preparation for implanta-

19  tion will survive the thawing process, many have and will.

20      50.  The modern science of *in vitro* fertilization has given rise to the adop-

21  tion of "children *in vitro*" as human embryos, and Mary Scott Doe, on behalf of

22  herself as a frozen human embryo and all others similarly situated, prays for an

23  injunction against her use for California state-funded, human embryo stem cell

24  experimentation, or for California state-funded, somatic cell nuclear transfer,

25  which would result in her and other human embryos' certain death and destruc-

26  tion, so that she and the other human embryos she seeks to represent might, in

27  place of death, be given the opportunity of adoption as a "child *in vitro*" so that

28  she and they might fulfill their destiny as human beings (B-29).

51.  One such human embryo adoption program is the Snowflakes human embryo program of Nightlight Christian Adoptions of Fullerton, California.

52.  The Snowflakes program, which began in 1997, has resulted in the labor and delivery of seventy-four (74) children, and another fifteen (15) babies are due through September 2005. *See* Affidavit of Ronald L. Stoddart, ¶ 9 at p. 3, attached hereto as Exhibit "C."  (81 children as of meeting of President Bush with Snowflakes embryo babies May 24, 2005, East Room of the White House.)

53.  Although frozen embryo adoption programs are still in their infancy, the public response to these programs has validated several important assumptions:

a.   Genetic parents with frozen human embryos ("children *in* vitro")(B-43), given the choice of having their embryos destroyed, donated for experimentation, or placed for adoption, will overwhelmingly choose adoption or leaving the embryos in cryo-banks.  It is very rare for families to choose destruction or experimentation.  (Those seeking to perform human embryo experimentation use the euphemistic term "research") ("human embryo research").

b.   There is a growing number of potential adopting parents who will adopt and carry human embryos (children *in* vitro) to term.

c.   The potential for finding families to adopt every human embryo (child *in vitro*) available for adoption is more than great; it borders on a certainty.  The cost of such adoptions is typically less than more traditional adoptions, and it carries far fewer risks of losing a child asso-

FIRST AMENDED COMPLAINT

1    ciated with children born to birthmothers and then placed

2    for adoption.

3    d.    The ability of an adopting mother to carry and give birth

4    to her own adopted child *in vitro*, making the child her

5    birth child and adopted child, is extremely appealing to

6    the majority of potential adopting parents.  The medical

7    efficacy of the procedures involved have been proven.

8

9    54.  The human embryo is a living entity, a human being, a human individ-

10    ual, and a person, all one and inseparable.  *See* Affidavit of Professor C. Ward

11    Kischer, attached hereto as Exhibit "D."

12    55.   As has been pointed out by human embryologist, C. Ward Kischer,

13    Ph.D., in his article, "When Does Human Life Begin? The Final Answer," pub-

14    lished in The Linacre Quarterly, 2003.V.70: 326-339, a copy of which is attached

15    hereto as Exhibit "E":

16    Virtually every human embryologist and every major

17    textbook of Human Embryology, states that *fertilization*

18    *marks the beginning of the life of the new individual*

19    *human being.*

20    The reason why this is true is the following:

21    from the moment when the sperm makes contact with

22    the oocyte [egg], under conditions we have come to

23    understand and describe as *normal*, all subsequent devel-

24    opment to birth of a living newborn is a *fait accompli.*

25    That is to say, after that initial contact of spermatozoon

26    and oocyte there is no subsequent moment or stage that

27    is held in arbitration or abeyance by the mother, or the

28    embryo or fetus.  Nor is a second contribution, a signal

12        FIRST AMENDED COMPLAINT

1    or trigger, needed from the male in order to continue and

2    complete development to birth.  Human development is

3    a ***continuum*** in which so-called stages overlap and blend

4    one into another.  Indeed, all of life is contained within a

5    time ***continuum.***  Thus, the beginning of a new life is

6    exacted by the beginning of fertilization, the reproduc-

7    tive event which is the *essence* of life.

8    Exhibit "E" at page 3 (italics and emphasis in original.)

9       56.  Everything necessary to build Mary Scott Doe and the other human

10   embryos *in vitro* that she seeks to represent, is present, sufficient and complete,

11   from the very beginning, i.e., at the moment of fertilization.  Nothing is added.

12   Everything necessary to build the human brain, capable of going to the moon and

13   putting foot on the moon, is locked in at the moment of fertilization, the reproduc-

14   tive event which is the beginning of a new human life (B-17).

15      57.  Such a realization that everything necessary and complete to build and

16   become the new human being we will later call "Mary" or "David" who would fit

17   on the tip of a needle is too wonderful for man.  It is high; he cannot attain it.

18      58.  Science now proves to man that he is fearfully and wonderfully made;

19   the creation of God (the same God in Whom America places her trust on the back

20   of her money—our national motto), and this same God is referenced in the

21   California Constitution, which provides in pertinent part:

22   "We, the People of the State of California, grateful to *Almighty God*

23   for our freedom, in order to secure and perpetuate its blessings, do

24   establish this Constitution."

25   Cal.Const., Preamble (emphasis added).

26      59.  Mary Scott Doe's forefathers truly stated in the Declaration of

27   Independence, the charter of her nation, that " . . . all men are *created* [by God]

28   equal and endowed *by their creator* with certain inalienable rights, that among

these are life, liberty, and the pursuit of happiness."  (Emphasis added.)

60.  Mary Scott Doe and the other human embryos she seeks to represent, by virtue of their equal creation, claim their right to equal life, liberty, and the pursuit of happiness as part of our Nation's "Posterity," as referenced in the Preamble of the United States Constitution ("We the People of the United States, in Order to form a more perfect Union, establish Justice...and secure the Blessings of Liberty to ourselves and our POSTERITY, do ordain and establish this Constitution for the United States of America").

61.  Included within Mary Scott Doe's (and every human embryo's) right to life, liberty, and the pursuit of happiness—which rights are vouchsafed by the due process and equal protection guarantees of both the Fourteenth Amendment and Cal. Const. Art. I, § 7(a), by the freedom from slavery and involuntary servitude guaranteed by the Thirteenth Amendment and Cal. Const. Art. I, § 6, and by the inalienable rights acknowledged and/or guaranteed by Cal.Const. Art. I, § 1 and the Declaration of Independence–is her right to the opportunity to be adopted by a married couple wishing to adopt a frozen human embryo (a "child *in vitro*")(E-43) and thus to be removed from the deep freeze of cryo-preservation and returned to the warmth of life and implanted in an adopting mother's womb (E-43).

62.  That upon adoption and implantation in an adopting mother's womb, Mary Scott Doe may fulfill her destiny by beginning a nine month journey as a "child *in utero*" within the "innerspace" of the vaulted temple of the womb with its filtered reddish light (curiously much like the filtered light of a stained glass cathedral that man later builds as a house of worship to his Creator, reminding him, as it were, of the original "temple of the womb" in which his life began and in which he danced and turned somersaults full of gaiety and grace).

63.  Mary Scott Doe's entire substance is seen and known to her Creator when she is yet unformed, and, in her Creator's book, all her members are written, which in continuance are fashioned, when as yet there are none of them.

14                                     FIRST AMENDED COMPLAINT

64.  The Court may take judicial notice that, at the beginning of the twenty-first century, mothers carry to term their own daughter's child, such that the grandmother's temple of the womb offers temporary shelter to her granddaughter conceived by that grandmother's daughter.

65.  The Court may likewise take judicial notice of the fact that there is no medical, scientific or legal requirement that a frozen human embryo be returned to the womb of her genetic mother in order to continue to grow into a fully developed human life, but rather such a human embryo may be implanted and brought to term in the womb of an adopting mother.

66.  The Court may also take judicial notice that the adoption of frozen human embryos is by now a common occurrence, and that entire organizations have come into being and now exist to bring together frozen human embryos and prospective adoptive parents, including the Snowflakes human embryo program located in Fullerton, California.

67.  It is neither fair nor truthful to regard Mary Scott Doe, or any other human embryo *in vitro*, as a human being only if she is adopted and implanted in the womb of an adopting mother and otherwise to label her just a "mass of cells", "biological material", or a "surplus product" if she is made the object of human embryo stem cell experimentation.

68.  Complete and sufficient within Mary Scott Doe is the ability, upon adoption and implantation in an adopting mother's womb, to build herself like a little astronaut in the "innerspace" of the temple of the womb.  Mary Scott Doe hooks onto the wall of the adopting mother's womb in order to receive nutrients and oxygen and builds and extends her own little astronaut lifeline (the placenta) through which she will continue to receive nutrients and oxygen with which to build her body, which will be ready for "labor and delivery" in approximately nine months.

69.  For the purpose of building her body, Mary Scott Doe also builds a little bubble spacesuit around herself for her journey in "innerspace" until she passes

1  a chemical message over her placenta back to the body of the "mothership" (the

2  adopting mother) signaling and initiating in her adopting mother's body the con-

3  tractions of labor which will "deliver" Mary Scott Doe from the "innerspace" of

4  the temple of the womb to the "outerspace" of the sunshine of the smiling faces of

5  her fellow humanity.

6      70.  Mary Scott Doe is a "being", and being human, she is a human being.

7  She is "person" and not "property" because she is the only 'property' which has

8  the 'property' of building herself, even the human brain capable of going to the

9  moon and putting foot on the moon.  She is a "person" for purposes of both the

10 Fourteenth Amendment and Cal.Const. Art. I, § 7(a), and a member of "the peo-

11 ple" for purposes of Cal.Const. Art. I, § 1 (E-29 & E-43).

12     71.  As a developing human being, Mary Scott Doe is entitled to the equal

13 respect of the high Constitutional ideals and protection of both the Constitution of

14 the State of California and the Constitution of the United States of America, of

15 which California is a part.

16     72.  To deny such equal protection to Mary Scott Doe and to the other

17 human embryos she seeks to represent is to deny the protection of the California

18 Constitution and of the United States Constitution to all of the "people" of

19 California and to all "persons" in the United States.

20     73.  If one acknowledges that the builder of Mary Scott Doe's body is, in

21 fact, God, the Creator, referenced and reverentially acknowledged in both the

22 Preamble to the Constitution of the State of California and the Declaration of

23 Independence, Mary Scott Doe is entitled to reverential respect as a developing

24 human life and as a creation of God.

25     74.  The decision of the United States Supreme Court in *Roe v. Wade*, 410

26 U.S. 113 (1973), is wholly inapplicable and inapposite to this matter because,

27 unlike in the case of a preborn child *in utero*, there is no countervailing person-

28 hood of the "mother" whose "right to choose" allegedly overshadows the person-

hood and constitutional rights of Mary Scott Doe, a human embryo *in vitro*. This is not an abortion case. Mary Scott Doe is separate and apart from her genetic mother and is seeking to have her own rights protected by enjoining the actions, not of her genetic mother, but of state government officials and entities who seek to fund experimentation that inevitably will cause her death and destruction.

<u>FACTUAL BACKGROUND OF THE CASE</u>

75. On November 2, 2004, the California electorate passed an initiative measure known as Proposition 71.

76. As a result of the passage of Proposition 71, Article XXXV was added to the California Constitution, establishing, as an agency of the California state government, the California Institute of Regenerative Medicine (hereinafter "CIRM"), and providing that CIRM "shall have" the purpose, among others, "[t]o make grants and loans for stem cell research." *See* Cal.Const. Art. XXXV, §§ 2(a), 6 (those wishing to experiment upon human embryos without their consent present it as "research"—a more acceptable term).

77. Section 5 of Article XXXV further establishes "a right to conduct stem cell research," (human embryo stem cell—the words "human embryo" are purposely deleted so as to make the connection with "adult" stem cells; adult stem cell experimentation does not involve the death of the human being from which they are taken), which state constitutional right is specifically defined as including "research involving adult stem cells, cord blood stem cells, *pluripotent stem cells*, and/or progenitor cells." Cal.Const. Art. XXXV, § 5 (emphasis added).

78. Section 5 of Article XXXV defines "pluripotent [embryonic] stem cells" as "cells that are capable of self-renewal, and have broad potential to differentiate into multiple adult cell types" and further states that such embryonic stem cells "may be derived from somatic cell nuclear transfer *or from surplus products* (human embryo/"children *in vitro*" are labeled "surplus products") *of in vitro fertilization treatments when such products are donated* (by whose authority do we

1  donate small human beings into slavery and human experimentation?) *under*

2  *appropriate informed consent procedures*.(by whose authority may a mother and

3  father consent to donate their child or children into slavery?)" Cal.Const. Art.

4  XXXV, § 5 (emphasis added).

5      79.  Article XXXV further provides that CIRM *"may utilize state issued*

6  *tax-exempt and taxable bonds to fund* its operations, *medical and scientific*

7  *research*, including therapy development through clinical trials, and facilities."

8  Cal.Const. Art. XXXV, § 6 (emphasis added).  (By what authority are state bonds

9  issued to begin that which is in derogation of the Constitution of the State of

10  California and the United States Constitution prohibiting slavery?)

11      80. As a further result of the passage of Proposition 71 by the California

12  electorate, the California Stem Cell Research and Cures Act, Cal. Health & Safety

13  Code § 125290.10 et seq., [hereinafter the "Stem Cell Act"] was enacted, creating

14  the ICOC as the 29-member governing body of CIRM and vesting the ICOC

15  "with full power, authority, and jurisdiction over the institute."  Cal. Health &

16  Safety Code § 125290.15.

17      81.  The ICOC is charged by the Stem Cell Act with establishing a variety

18  of "standards," including standards for the following:

19      (a) Informed Consent, i.e., standards "for obtaining the informed con-

20      sent of research donors [, who are defined by the Stem Cell Act as

21      humans who donate "biological materials" for research purposes after

22      full disclosure and consent, Cal. Health & Safety Code §

23      125292.10(t),], patients, or participants, which initially shall be gener-

24      ally based on the standards in place on January 1, 2003, for all

25      research funded by the National Institutes of Health, with modifica-

26      tions to adapt to the mission and objectives of the institute," Cal.

27      Health & Safety Code § 125290.35(b)(1); (but informed consent of

28      the very tiny human embryo without a voice, SAVE THIS HONOR-

FIRST AMENDED COMPLAINT

ABLE COURT, is conveniently omitted although it is an unques-
tioned principle of medical ethics not to experiment upon a human
being without that exact human being's consent);

(b) Controls on Research Involving Humans, i.e., standards "for the
review of research involving human subjects which initially shall be
generally based on the Institutional Review Board standards promul-
gated by the National Institutes of Health and in effect on January 1,
2003, with modifications to adapt to the mission and objectives of the
institute," Cal. Health & Safety Code § 125290.35(b)(2); (NIH first
began to press for human embryo experimentation under the Carter
Administration and have established their own "standards" allowing
same, which human embryo experimentation has been rejected by the
administrations of President Carter, President Reagan (indeed, he
signed the Emancipation Proclamation of Preborn Children protecting
human beings from conception/fertilization), President Bush the Elder
and President George W. Bush.  Only the Clinton Administration
endorsed human embryo experimentation and attempted to begin it)
and

(c) Time Limits for Obtaining Cells, i.e., standards "setting a limit on
the time during which cells may be extracted from blastocysts (anoth-
er term used to depersonalize a stage of the new human being about
to be subjected to experimentation), which shall initially be 8 to 12
days after cell division begins, not counting any time during which
the blastocysts and/or cells have been stored frozen," Cal. Health &
Safety Code § 125290.35(b)(6).

82.  The ICOC is also empowered by the Stem Cell Act to "[m]ake final
decisions on research standards and grant awards in California."  Cal. Health &
Safety Code § 125290.40(c).

1   83.  In addition, the Stem Cell Act provides that the ICOC, "[n]otwithstand-

2   ing the [California] Administrative Procedure Act (APA), and in order to facilitate

3   the immediate commencement of research covered by [the Stem Cell Act], . . .

4   may adopt interim regulations without compliance with the procedures set forth in

5   the APA," such interim regulations to remain in effect for 270 days "unless earlier

6   superseded by regulations adopted pursuant to the APA."  Cal. Health & Safety

7   Code § 125290.40(k).

8   84.  CIRM is directed by the Stem Cell Act to create a 23-member,

9   "Scientific and Medical Research Funding Working Group" within 30 days after

10  the election and appointment of the initial ICOC members, which working group

11  is empowered and directed to, among other things,

12      (a) "[r]ecommend to the ICOC interim and final criteria, standards,

13      and requirements for considering funding applications and for award-

14      ing research grants and loans," Cal. Health & Safety Code §

15      125290.60(b)(1); and

16      (b) "[r]ecommend its first grant awards within 60 days of the

17      issuance of the interim standards," Cal. Health & Safety Code §

18      125290.60(b)(7).

19  85.  The term "interim standards" as that term is used in the Stem Cell Act

20  is defined as meaning "temporary standards that perform the same function as

21  'emergency regulations' under the [California] Administrative Procedure Act

22  ([California] Government Code, Title 2, Division 3, Part 1, Chapter 4.5, Sections

23  11371 et seq.) except that in order to provide greater opportunity for public com-

24  ment on the permanent regulations, remain in force for 270 days rather than 180

25  days." Cal. Health & Safety Code § 125292.10(n).

26  86.  On information and belief, CIRM, acting through its governing body

27  the ICOC, has begun the process of obtaining a loan from the California state

28  treasury in order to hire staff and to begin operating, and the agency expects to

1    award its first grants for stem cell experimentation by as early as May 2005,

2    which California state-funded, stem cell research and experimentation will

3    inevitably result in the destruction of Mary Scott Doe and of many of the other

4    human embryos she represents.

5         87.  Contrary to the Stem Cell Act's assertion that "[t]hese excess cells from

6    *in vitro* fertilization treatments would otherwise be intended to be discarded if not

7    utilized for medical research," Cal. Health & Safety Code § 125292.10(q), the adop-

8    tion of frozen human embryos is by now a common occurrence, and entire organiza-

9    tions have come into being and now exist to bring together frozen human embryos

10   and prospective adoptive parents, including the Snowflakes program in Fullerton,

11   California, part of the Christian Adoption and Family Services of California.

12        88.  Mary Scott Doe, as a human embryo, has been produced or brought

13   into life from the moment of her conception or fertilization.  She is not merely

14   "excess cells," or a "surplus product," or some "biological material," but a human

15   being, that is both living and genetically unique, as well as capable of developing

16   into an adult.

17        89.  Derivation of stem cells from human embryos terminates and destroys

18   them, and, thus, the experimenters, whose experiments the Defendants propose to

19   fund through grants of state monies, must inevitably kill and destroy human

20   embryos.

21        90.  Mary Scott Doe, and the other human embryos *in vitro* that she seeks to

22   represent, are the smallest and most immature and most utterly incapacitated of

23   human beings, and they are incapable of giving an informed consent to their use in

24   research and experimental procedures.

25        91.  Neither is the genetic mother nor the genetic father of a human embryo

26   capable of giving a valid informed consent to the use of such a developing human

27   life in experimental procedures that will result in the human embryo's certain

28   destruction, anymore than the genetic mother or father of a child could give a

1  valid, informed consent to the child being subjected to human slavery and
2  experimentation.

3      92.  The utilitarian thinking underlying Defendants' proposed government
4  funding of human embryo stem cell experimentation is what led to the Nazi exper-
5  imentation on concentration camp prisoners during World War II (and, of all the
6  experiments performed upon human beings by the Nazi government, not a single
7  advance for medical science resulted).  The same utilitarian thinking led the
8  United States Government to conduct radiation experiments on unwitting human
9  subjects during the Cold War.

10     93.  Despite this recent history, Defendants stand poised to approve and
11 release research grants of state monies to experimenters who will use such govern-
12 ment grants to begin human embryo stem cell experimentation.  This is the same
13 forced experimentation on human subjects that occurred over sixty (60) years ago,
14 cleaned up, sanitized, and miniaturized.  Human embryo experimentation is worse
15 than what happened sixty years ago because it is against all humanity.

16     94.  All human beings, even as human embryos, have an inalienable right to
17 life received immediately from God and not from their parents or some society or
18 human authority.  *Thus, there is no man, no science, no human authority, no med-*
19 *ical, social, eugenic, economic, moral indication that could produce or give a*
20 *valid statutory, constitutional, legal, or jurisdicial title to dispose directly or delib-*
21 *erately of an innocent human life.*

22                    COUNT ONE
23  DECLARATORY JUDGMENT AND INJUNCTION: VIOLATION OF DUE
24                     PROCESS

25     95.  Plaintiffs hereby incorporate the allegations of Paragraphs 1 through 91
26 of the Complaint, as if fully set forth herein at length.

27     96.  Mary Scott Doe, a human being and "child *in vitro*", and the other
28 human embryos she seeks to represent, are

                        22                    FIRST AMENDED COMPLAINT

(a) each a human embryo *in vitro,* a living entity, a developing human life, a human being, a human individual, and a person; and are

(b) each a member of the "people" of California under Cal.Const. Art. I, § 1 entitled to the inalienable rights guaranteed thereunder, and, thus, a "human being" and a "person" as recognized under California law, and, thus, for either or both of these reasons, they are each a "person" entitled to the protection of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

96. The personhood of Mary Scott Doe and the other human embryos she represents is supported by the fact that, on January 18, 1988, President Ronald Reagan, who was also a two-term governor of the State of California, issued a Presidential Proclamation that has become known as the "Emancipation Proclamation of Preborn Children" (and simultaneously therewith proclaimed January 17, 1988 as a national Sanctity of Human Life Day), which Presidential Proclamation provides as follows:

"NOW THEREFORE, I, RONALD REAGAN, President of the United States, by virtue of the authority vested in me by the Constitution and laws of the United States, do hereby proclaim and declare *the unalienable personhood of every American, from the moment of conception until natural death*, and I do proclaim, ordain, and declare that I will take care that the Constitution and laws of the United States are faithfully executed for the protection of America's unborn children. Upon this act, sincerely believed to be an act of justice, warranted by the Constitution, I invoke the considerate judgment of mankind and the gracious favor of Almighty God. I also proclaim Sunday, January 17, 1988, as a national Sanctity of Human Life Day. I call upon the citizens of this blessed land to gather on that day in their homes and places of worship to give thanks for the gift of life

FIRST AMENDED COMPLAINT

they enjoy and to reaffirm their commitment to the dignity of every human being and sanctity of every human life." (Emphasis added.)

97. Mary Scott Doe, a human embryo, from the time of her fertilization and conception, therefore possessed and possesses "unalienable personhood", as well as inalienable rights.

98. As all human lives began and continue to begin as a human embryo, to treat Mary Scott Doe and the other human embryos that she represents as "biological material" or "excess cells" or "surplus products" to be experimented upon, and not as "persons" and "human beings" with unalienable personhood and inalienable rights, is to begin a denatured biology and a very dim future for mankind.

99. By proposing to fund human embryo stem cell experimentation, which experimentation necessarily requires the destruction of human embryos in order to obtain the stem cell lines required for the conduct of such experimentation, Defendants are imminently threatening to deprive Mary Scott Doe and the other human embryos she represents of their lives and liberty, including the opportunity to be adopted and brought to term by an adoptive mother, without substantive or procedural due process in violation of the Fourteenth Amendment.

100. To the extent that the California Stem Cell Act, Cal. Health & Safety Code § 125290.10 et seq., authorizes Defendants to adopt interim and final research standards for, and to approve and issue grants of state monies to fund, human embryo stem cell experimentation, such Act threatens to deprive Mary Scott Doe and the other human embryos she represents of their lives and liberty, including the opportunity to be adopted and brought to term by an adoptive mother, without substantive or procedural due process in violation of the Fourteenth Amendment.

101. To the extent that Article XXXV, Section 5 of the California Constitution establishes a state constitutional "right" to conduct state-funded,

FIRST AMENDED COMPLAINT

human embryo stem cell research, which "right" expressly authorizes stem cells to be "derived . . . from surplus products of *in vitro* fertilization treatments," i.e., from human embryos, thereby resulting in their immediate destruction, Article XXXV, Section 5 threatens to deprive Mary Scott Doe and the other human embryos she represents of their lives and liberty, including the opportunity to be adopted and brought to term by an adoptive mother, without substantive or procedural due process in violation of the Fourteenth Amendment.

102. To the extent that the Article XXXV and the Stem Cell Act authorize genetic parents, guardians or other "research donors" to donate human embryos in vitro for state-funded research projects, after full disclosure to and consent of the research donor, but NOT OF THE HUMAN EMBRYOS THEMSELVES who are incapable of giving an informed consent to their use in stem cell experimentation, Article XXXV and the Stem Cell Act threaten to deprive Mary Scott Doe and the other human embryos she represents of their lives and liberty, including the opportunity to be adopted and brought to term by an adoptive mother, without substantive or procedural due process in violation of the Fourteenth Amendment.

103. The Declaratory Judgment Act authorizes this Court, "[i]n a case of actual controversy within its jurisdiction, . . . [to] declare the rights and other legal relations of any interested party seeking such declaration" and to grant "[f]urther necessary or proper relief" based on such declaratory judgment, *see* 28 U.S.C. §§ 2201, 2202.

104. Mary Scott Doe is an "interested party" entitled to declaratory and other necessary and proper relief under the Declaratory Judgment Act.

105. Plaintiffs Peter and Suzanne Murray, Tim and Courtney Atnip, Steven and Kate Johnson, and Cara and Gregory Vest are also "interested parties" entitled to declaratory and other necessary and proper relief under the Declaratory Judgment Act, in that, (a) as parents who are seeking to adopt *in vitro* human embryos, they will be injured by Defendants' threatened actions as authorized and

1  mandated by the California Stem Cell Research and Cures Act, Cal. Health &
2  Safety Code § 125290.10 et seq., and Article XXXV of the California
3  Constitution, in that such actions will reduce the number of *in vitro* human
4  embryos available for adoption, and (b) as parents who are seeking to adopt *in*
5  *vitro* human embryos, such as Mary Scott Doe, they have standing to raise and
6  assert the constitutional rights of these human embryos and prospective "children
7  *in vitro*."

8        WHEREFORE, Plaintiffs pray for the entry of a judgment against the
9  Defendants:

10        (a) Declaring that Mary Scott Doe and the other human embryos *in vitro*
11  that she represents are "persons" who are entitled to the protection of the Due
12  Process Clause of the Fourteenth Amendment to the United States Constitution;

13        (b) Declaring that the California Stem Cell Research and Cures Act, Cal.
14  Health & Safety Code § 125290.10 et seq., insofar as it authorizes Defendants to
15  adopt interim and final research standards for, and to approve and issue grants of
16  state monies to fund, human embryo stem experimentation, is null and void as
17  violative of the Due Process Clause of the Fourteenth Amendment;

18        (c) Declaring that Article XXXV, Section 5 of the California Constitution,
19  insofar as it establishes a state constitutional "right" to conduct state-funded,
20  human embryo stem cell research, including the "right" to derive stem cells from
21  human embryos, resulting in their immediate death and destruction, is null and
22  void as violative of the Due Process Clause of the Fourteenth Amendment;

23        (d) Declaring that Article XXXV of the California Constitution and the
24  California Stem Cell Research and Cures Act, Cal. Health & Safety Code §
25  125290.10 et seq., insofar as they authorize genetic parents or other "research
26  donors" to donate human embryos *in vitro* for state-funded research projects, after
27  full disclosure and consent of the research donors, but not of the human embryos
28  who are incapable of giving an informed consent to their use and destruction in

FIRST AMENDED COMPLAINT

1  research or experimentation, are null and void as violative of the Due Process

2  Clause of the Fourteenth Amendment;

3      (e) Temporarily and permanently enjoining Defendants, as well as their

4  employees, officers, and agents, from (i) issuing or adopting any interim or final

5  standards governing either the conduct of human embryo stem cell research and/or

6  experimentation, the donation of human embryos for such research and/or experi-

7  mentation, and/or the derivation of stem cells from living human embryos, (ii)

8  approving or issuing any bonds and/or any grant of state funds or monies to

9  finance or fund human embryo stem cell research and/or experimentation projects,

10  or (iii) undertaking any other action to encourage, assist or facilitate human

11  embryo stem cell research and/or experimentation;

12      (f) Awarding Plaintiffs their costs of suit; and

13      (g) Granting such other relief as to this Honorable Court may seem just and

14  equitable.

15

16  COUNT TWO

17  DECLARATORY JUDGMENT AND INJUNCTION: VIOLATION OF EQUAL

18  PROTECTION

19

20      106.  Plaintiffs hereby incorporate the allegations of Paragraphs 1 through

21  104 of the Complaint, as if fully set forth herein at length.

22      107.  Mary Scott Doe, and the other human embryos she seeks to represent,

23  are

24      (a) each a human embryo *in vitro,* a living entity, a developing human

25      life, a human being, a human individual, and a person; and are

26      (b) each a member of the "people" of California under Cal.Const. Art.

27      I, § 1 entitled to the inalienable rights guaranteed thereunder, and,

28      thus, a "human being" and a "person" as recognized under California

27          FIRST AMENDED COMPLAINT

1   law,

2   and, thus, for either or both of these reasons, they are each  a "person" entitled to

3   the protection of the Equal Protection Clause of the Fourteenth Amendment to the

4   United States Constitution.

5       108.  Article XXXV, Section 5 of the California Constitution, by treating

6   Mary Scott Doe and the other human embryos she represents, not as developing

7   human lives on a par with other human life, but rather as "biological material",

8   "excess cells" and "surplus products of in vitro fertilization" that may be summar-

9   ily destroyed in order to derive stem cells from such embryos for experimentation

10  purposes, threatens to deprive Mary Scott Doe and the other human embryos *in*

11  *vitro* she represents of the equal protection of the laws in violation of the

12  Fourteenth Amendment.

13      109.  Article XXXV of the California Constitution and the Stem Cell Act,

14  by treating Mary Scott Doe and the other human embryos she represents, not as

15  developing human lives on a par with other human life, but rather as "surplus

16  products," "excess cells" or "biological material" that may be donated for use in

17  state-funded, human embryo stem cell research and/or experimentation projects,

18  even though such use will inevitably result in the death and destruction of the

19  donated human embryos, threatens to deprive Mary Scott Doe and the other

20  human embryos *in vitro* that she represents of the equal protection of the laws in

21  violation of the Fourteenth Amendment.

22      110.  Article XXXV of the California Constitution and the Stem Cell Act,

23  by authorizing state-funded, human embryo stem cell experimentation, despite the

24  impossibility of obtaining any kind of valid informed consent from the subjects of

25  such research, while requiring valid informed consents from other human subjects

26  of state-funded research, threatens to deprive Mary Scott Doe and the other human

27  embryos *in vitro* that she represents of the equal protection of the laws in violation

28  of the Fourteenth Amendment.

1     111.  By proposing to fund human embryo stem cell experimentation, which

2     experimentation necessarily requires the destruction of human embryos in order to

3     obtain the stem cell lines required for the conduct of such experimentation,

4     Defendants are imminently threatening to deprive Mary Scott Doe and the other

5     human embryos she represents of the equal protection of the laws in violation of

6     the Fourteenth Amendment.

7          WHEREFORE, Plaintiffs pray for the entry of a judgment against the

8     Defendants:

9          (a)  Declaring that Mary Scott Doe and the other human embryos *in vitro*

10    that she represents are "persons" who are entitled to the protection of the Equal

11    Protection Clause of the Fourteenth Amendment to the United States Constitution;

12         (b)  Declaring Article XXXV, Section 5 of the California Constitution, inso-

13    far as it treats human embryos *in vitro*, developing human lives, as "biological

14    material", "excess cells" and/or "surplus products of in vitro fertilization" that

15    may be summarily destroyed in order to derive stem cells from such embryos for

16    research and experimentation purposes, null and void as violative of the Equal

17    Protection Clause of the Fourteenth Amendment;

18         (c) Declaring Article XXXV of the California Constitution and the

19    California Stem Cell Research and Cures Act, Cal. Health & Safety Code §

20    125290.10 et seq., insofar as they treat human embryos as "surplus products,"

21    "excess cells" and/or "biological material" that may be donated for use in state-

22    funded, human embryo stem cell research and/or experimentation projects, even

23    though such use will inevitably result in the destruction of the donated human

24    embryos, null and void as violating the Equal Protection Clause of the Fourteenth

25    Amendment;

26         (d)  Declaring Article XXXV of the California Constitution and the

27    California Stem Cell Research and Cures Act, Cal. Health & Safety Code §

28    125290.10 et seq., insofar as they authorize state-funded, human embryo stem cell

research and experimentation, despite the impossibility of obtaining any kind of valid informed consent from the human subjects of such research, null and void as violating the Equal Protection Clause of the Fourteenth Amendment;

(e)  Temporarily and permanently enjoining Defendants, as well as their employees, officers, and agents, from (i) issuing or adopting any interim or final standards governing either the conduct of human embryo stem cell research and/or experimentation, the donation of human embryos for such research and/or experi-mentation, and/or the derivation of stem cells from living human embryos, (ii) approving or issuing any bonds and/or grant of state funds or monies to finance or fund human embryo stem cell research and/or experimentation projects, or (iii) undertaking any other action to encourage, assist or facilitate human embryo stem cell research and/or experimentation;

(f) Awarding Plaintiffs their costs of suit; and

(g) Granting such other relief as to this Honorable Court may seem just and equitable.

## COUNT THREE
## DECLARATORY JUDGMENT AND INJUNCTION: VIOLATION OF THIRTEENTH AMENDMENT

112.  Plaintiffs hereby incorporate the allegations of Paragraphs 1 through 110 of the Complaint, as if fully set forth herein at length.

113.  Mary Scott Doe, a human embryo *in vitro* and a developing human life, is a "party" and a "human being" entitled to the protection of the Thirteenth Amendment to the United States Constitution.

114.  Article XXXV and the Stem Cell Act, insofar as they treat human embryos as "surplus products," "excess cells" and/or "biological material" that may be donated for use and destruction in state-funded, human embryo stem cell

FIRST AMENDED COMPLAINT

1 research and/or experimentation projects, without the consent of the human

2 embryos themselves, threatens to subject Mary Scott Doe and the other human

3 embryos *in vitro* that she represents to a form of slavery or involuntary servitude

4 in violation of the Thirteenth Amendment to the United States Constitution.

5       115.  Human embryo stem cell research necessarily requires a human

6 embryo, i.e., a human being, to be treated like an experimental animal that is

7 "property" and that therefore can be donated, devised, bought or sold for research

8 purposes, and by so treating human embryos, and, thus, human beings as property,

9 such experimentation violates the Thirteenth Amendment to the United States

10 Constitution.

11       116.  By proposing to fund or otherwise to facilitate, assist or encourage

12 human embryo stem cell research and experimentation, which research and experi-

13 mentation necessarily requires the involuntary use and destruction of human

14 embryos in order to obtain the stem cell lines required for the conduct of such

15 research and experimentation, Defendants are imminently threatening to deprive

16 Mary Scott Doe and the other human embryos she represents of their right to be

17 free from slavery and/or involuntary servitude in violation of the Thirteenth

18 Amendment.

19       WHEREFORE, Plaintiffs pray for the entry of a judgment against the

20 Defendants:

21       (a) Declaring that Mary Scott Doe and the other human embryos *in vitro*

22 that she represents are "parties" who are entitled to the protection of the

23 Thirteenth Amendment to the United States Constitution;

24       (b)  Declaring Article XXXV of the California Constitution and the

25 California Stem Cell Research and Cures Act, Cal. Health & Safety Code §

26 125290.10 et seq., insofar as they treat human embryos as "surplus products,"

27 "excess cells" and/or "biological material" that may be donated for involuntary

28 use and destruction in state-funded, human embryo stem cell research and/or

1  experimentation projects, without the consent of the human embryos themselves,

2  violative of the Thirteenth Amendment to the United States Constitution;

3       (c)  Temporarily and permanently enjoining Defendants, as well as their

4  employees, officers, and agents, from (i) issuing or adopting any interim or final

5  standards governing either the conduct of human embryo stem cell research and/or

6  experimentation, the donation of human embryos for such research and/or experi-

7  mentation, and/or the derivation of stem cells from living human embryos, (ii)

8  approving or issuing any bonds and/or grant of state funds or monies to finance or

9  fund human embryo stem cell research and/or experimentation projects, or (iii)

10  undertaking any other action to encourage, assist or facilitate human embryo stem

11  cell research and/or experimentation;

12       (d) Awarding Plaintiffs their costs of suit; and

13       (e) Granting such other relief as to this Honorable Court may seem just and

14  equitable.

15

16  COUNT FOUR

17  <u>DECLARATORY JUDGMENT AND INJUNCTION: FEDERAL PREEMPTION</u>

18

19       117.  Plaintiffs hereby incorporate the allegations of Paragraphs 1 through

20  116 of the Complaint, as if fully set forth herein at length.

21       118.  The United States Congress has proscribed, in Section 510 of the

22  Consolidated Appropriations Act of 2004, enacted on January 23, 2004, the expen-

23  diture of any federal money for human embryo stem cell experimentation, as fol-

24  lows:

25       SEC. 510. (a) *None of the funds made available in this Act may be*

26       *used for–*

27       (1) the creation of a human embryo or embryos for research purpos-

28       es; or

32

FIRST AMENDED COMPLAINT

(2) *research in which a human embryo or embryos are destroyed, discarded, or knowingly subjected to risk of injury or death* greater than that allowed for research on fetuses in utero under 45 CFR 46.208(a)(2) and section 498(b) of the Public Health Service Act (42 U.S.C. 289g(b)).

(3) For purposes of this section, the term "human embryo or embryos" includes an organism, not protected as a human subject under 45 CFR 46 as of the date of enactment of this Act, that is derived by fertilization, parthenogenesis, cloning, or any other means from one or more human gametes or human diploid cells.

Section 510 of Public Law 108-199, 118 Stat. 3, 277 (January 23, 2004) (emphasis added).

119.  The State of California receives billions of dollars annually in Federal assistance, making it possible for the State to attempt to devote up to three (3) billion dollars of the state bond initiatives authorized by Article XXXV and the Stem Cell Act to a purpose proscribed and prohibited by the Congress of the United States.

120.  Under Section 510 of the Consolidated Appropriations Act of 2004, the use of federal dollars for human embryo stem cell research and experimentation is directly forbidden.

121.  By adding Article XXXV to the California Constitution and enacting the Stem Cell Act, Proposition 71 attempts to do indirectly what cannot be done directly by using funds raised through the issuance of state bonds to get around the federal ban.

122.  Were it not for the federal dollars received by the government of the State of California each year, the monies raised and to be raised by the sale of state bonds, that are sought to be expended by the State of California for human

FIRST AMENDED COMPLAINT

1 embryo research and experimentation, would have to be devoted, in whole or in

2 part, to state expenditures presently paid for with federal dollars.

3        123.  In effect, the federal dollars received by the government of the State

4 of California, including much of the federal appropriations made under the

5 Consolidated Appropriations Act of 2004, are subsidizing California's effort to

6 fund human embryo stem cell experimentation.

7        124.  California is therefore using federal dollars to do indirectly that which

8 it cannot use the federal dollars to do directly.

9        125.  Such indirect use of the federal dollars received by the State of

10 California to subsidize the funding of human embryo stem cell experimentation

11 violates the congressional ban of the use of federal funds for human embryo stem

12 cell research and experimentation set forth in Section 510 of the Consolidated

13 Appropriations Act of 2004 and is accordingly PREEMPTED BY FEDERAL

14 LAW.  *See* U.S. Const., Art. VI.

15        WHEREFORE, Plaintiffs pray for the entry of a judgment against the

16 Defendants:

17        (a) Declaring that the receipt and indirect use of federal funds by the gov-

18 ernment of the State of California to subsidize the funding of human embryo stem

19 cell research and experimentation violates and is preempted by Section 510 of the

20 Consolidated Appropriations Act of 2004, Public Law 108-199, § 510, 118 Stat. 3,

21 277 (January 23, 2004);

22        (b)  Temporarily and permanently enjoining Defendants, as well as their

23 employees, officers, and agents, from approving or issuing any bonds and/or grant

24 of funds or monies to finance or fund human embryo stem cell research and/or

25 experimentation projects, or somatic cell nuclear transfer research and/or experi-

26 mentation projects;

27        (d) Awarding Plaintiffs their costs of suit; and

28        (e) Granting such other relief as to this Honorable Court may seem just and

1    equitable.

2

3                               COUNT FIVE

4    DECLARATORY JUDGMENT AND INJUNCTION: INTERPRETATION OF

5    CALIFORNIA CONSTITUTION RECONCILING ARTICLE XXXV's RIGHT

6    TO CONDUCT STEM CELL EXPERIMENTATION WITH THE FUNDAMEN-

7    TAL RIGHTS GRANTED BY ARTICLE I OF SUCH CONSTITUTION

8

9         126.  Plaintiffs hereby incorporates the allegations of Paragraphs 1 through

10   125 of the Complaint, as if fully set forth herein at length.

11        127.  Mary Scott Doe, a human embryo *in vitro* and a developing human

12   life, is a "person" protected by Article I, Section 1 of the California Constitution,

13   which provides that "[a]ll people are by nature free and independent and have

14   inalienable rights" and that "[a]mong these are enjoying and defending life and

15   liberty . . . and pursuing and obtaining safety, happiness, and privacy."

16        128.  Mary Scott Doe is likewise a "person" protected by Article I, Section

17   7(a) of the California Constitution, which provides that "[a] person may not be

18   deprived of life, [or] liberty . . . without due process of law or denied equal pro-

19   tection of the laws."

20        129.  Mary Scott Doe is likewise a party protected by Article I, Section 6 of

21   the California Constitution, which prohibits slavery and involuntary servitude.

22        130.  In enacting, on November 2, 2004, Article XXXV, Section 5, estab-

23   lishing "a right to conduct stem cell research," the California electorate NEITHER

24   EXPREESSLY NOR BY IMPLICATION repealed any portion of the fundamental

25   constitutional protections afforded by Article I, Sections 1, 5, or 6 of the

26   California Constitution.

27        131.  When the various provisions of the California Constitution are con-

28   strued together, the "right to conduct stem cell research" established by newly

                                    35              FIRST AMENDED COMPLAINT

1 added Article XXXV, Section 5, cannot be regarded as an absolute, unfettered, or

2 unlimited right, but rather the exercise of the right to conduct stem cell experimen-

3 tation is limited and restricted by the fundamental rights accorded to all persons

4 and parties, including Mary Scott Doe, by the provisions of Article I of the

5 California Constitution.

6     132.  By proposing to fund *human embryo* stem cell research and experi-

7 mentation, which research and experimentation necessarily requires the involun-

8 tary use and destruction of human embryos in order to obtain the stem cell lines

9 required for the conduct of such research and experimentation, Defendants are

10 imminently threatening to exceed the scope of "the right to conduct stem cell

11 research" conferred by Article XXXV, Section 5 of the California Constitution and

12 to deprive Mary Scott Doe and the other human embryos she represents of (a)

13 their inalienable rights, including the right to enjoy and defend their lives and lib-

14 erty, in violation of Article I, Section 1 of the California Constitution, (b) their

15 right to be free from slavery and/or involuntary servitude in violation of Article I,

16 Section 6 of the California Constitution, and (c) their rights not to be deprived of

17 life and liberty without due process of law or denied equal protection of the laws

18 in violation of Article I, Section 7(a) of the California Constitution.

19     WHEREFORE,  Plaintiffs pray for the entry of a judgment against the

20 Defendants:

21     (a) Declaring that Mary Scott Doe and the other human embryos *in vitro*

22 that she represents are "persons" who are recognized as having inalienable rights,

23 including the right of enjoying and defending life and liberty, by Article I, Section

24 1 of the California Constitution;

25     (b) Declaring that Mary Scott Doe and the other human embryos *in vitro*

26 that she represents are "persons" entitled to the protection of the due process and

27 equal protection clauses of Article I, Section 7(a) the California Constitution;

28     (c) Declaring that Mary Scott Doe and the other human embryos *in vitro*

1  that she represents are parties entitled to the protection from slavery and involun-

2  tary servitude granted by Article I, Section 6 of the California Constitution;

3      (d) Declaring that the right to conduct stem cell research conferred by

4  Article XXXV, Section 5 of the California Constitution is not an absolute right,

5  but rather must be exercised in such a manner so as not to violate the fundamental

6  rights granted by Article I, Sections 1, 6 and 7(a) of the California Constitution;

7      (e) Declaring that the funding of human embryo stem cell research and

8  experimentation exceeds the scope of "the right to conduct stem cell research"

9  conferred by Article XXXV and violates (i) the inalienable rights of Mary Scott

10  Doe and of the other human embryos *in vitro* that she represents guaranteed by

11  Article I, Sections 1 of the California Constitution, (ii) their right to due process

12  and equal protection as guaranteed by Article I, Section 7(a) of the California

13  Constitution, and (iii) their right to be free from slavery and involuntary servitude

14  as guaranteed by Article I, Section 6 of the California Constitution;

15      (f) Temporarily and permanently enjoining Defendants, as well as their

16  employees, officers, and agents, from (i) issuing or adopting any interim or final

17  standards governing either the conduct of human embryo stem cell research and/or

18  experimentation, the donation of human embryos for such research and/or experi-

19  mentation, and/or the derivation of stem cells from living human embryos, (ii)

20  approving or issuing any bonds and/or grant of state funds or monies to finance or

21  fund human embryo stem cell research and/or experimentation projects, or (iii)

22  undertaking any other action to encourage, assist or facilitate human embryo stem

23  cell research and/or experimentation, as the duty to pay back those bonds is viola-

24  tive of the Preamble to the Constitution of the State of California and Article I,

25  Section 1's guarantee of INALIENABLE RIGHTS and California Constitution,

26  Article I, Section 6's prohibition against slavery.

27      (g) Awarding Plaintiffs their costs of suit; and

28      (h) Granting such other relief as to this Honorable Court may seem just and

FIRST AMENDED COMPLAINT

1  equitable.

2

3  <u>COUNT SIX</u>

4  <u>DECLARATORY JUDGMENT AND INJUNCTION: INTERPRETATION OF</u>
5  <u>THE CALIFORNIA CONSTITUTION RESOLVING THE IRRECONCILABLE</u>
6  <u>CONFLICT BETWEEN ARTICLE XXXV's RIGHT TO CONDUCT STEM</u>
7  <u>CELL RESEARCH WITH THE INALIENABLE RIGHTS GUARANTEED TO</u>
8  <u>MARY SCOTT DOE BY ARTICLE I, SECTION 1 OF SUCH CONSTITUTION</u>

9

10  133.  Plaintiffs hereby incorporate the allegations of Paragraphs 1 through
11  132 of the Complaint, as if fully set forth herein at length.

12  134.  The Preamble of the Constitution of the State of California provides in
13  pertinent part:

14  "We, the People of the State of California, grateful to Almighty God
15  for our freedom, in order to secure and perpetuate its blessings, do
16  establish this Constitution."

17  135.  Article I, Section 1 of the California Constitution provides in relevant
18  part that "*[a]ll people* are *by nature* free and independent and *have inalienable*
19  *rights*", much the same as the Declaration of Independence, the "charter" of our
20  nation, recites that "all men are created equal and *endowed by their Creator with*
21  *certain unalienable rights*."  (Emphasis added.)

22  136.  The "inalienable rights" referred to in Article I, Section 1 of the
23  California Constitution, like the "unalienable rights" referenced in the Declaration
24  of Independence, are beyond the reach of the legislative, executive, or judicial
25  branches of the state or federal government, which may only acknowledge, affirm,
26  or secure such inalienable or unalienable rights, but which may not alter, amend,
27  or abolish them.

28  137.  Assuming that the right to conduct stem cell research established by

Article XXXV, Section 5 includes the absolute and unfettered right to conduct human embryo stem cell research, which necessarily involves the involuntary use and destruction of human embryos, then an irreconcilable conflict exists between the right to conduct stem cell research established by Article XXXV, Section 5 of the California Constitution and the fundamental rights granted by Article I of the California Constitution, including especially the inalienable rights to the enjoyment and defense of life and liberty recognized and guaranteed by Article I, Section 1.

138.  In resolving this conflict, it must be recognized that the "inalienable rights" of the people GUARANTEED by Article I, Section 1 of the California Constitution PREEXISTED the original enactment of the state constitution, as the people have these inalienable rights "by nature" (the "Laws of Nature and Nature's God" referenced in the Declaration of Independence), and that these rights are therefore so fundamental that they cannot be abrogated by subsequent constitutional amendments, not even by amendments added by the initiative process.

139. To the extent that Article XXXV, Section 5 attempts to abrogate the fundamental and inalienable rights to the enjoyment and defense of life and liberty of Mary Scott Doe and of the other human embryos *in vitro* that she represents, by conferring a right to use and destroy human embryos for the conduct of human embryo stem cell research and experimentation, Article XXXV, Section 5 fatally conflicts with Article I, Section 1 of the California Constitution and is, to that extent, null and void and unenforceable.

WHEREFORE, Plaintiffs pray for the entry of a judgment against the Defendants:

(a) Declaring that Mary Scott Doe and the other human embryos *in vitro* that she represents are "persons" who are recognized as having inalienable rights, including the right of enjoying and defending life and liberty, by Article I, Section

1 of the California Constitution;

(b) Declaring that, to the extent that Article XXXV, Section 5 of the California Constitution attempts to abrogate and the fundamental and inalienable rights to the enjoyment and defense of life and liberty of human embryos *in vitro*, by conferring a right to use and destroy such human embryos for the conduct of human embryo stem cell research and experimentation, Article XXXV, Section 5 fatally conflicts with Article I, Section 1 of the California Constitution and is, to that extent, null and void and unenforceable, including the authority to issue state bonds to fund such an initiative and the duty imposed thereunder to back such bonds by the full faith and credit of the state of California since the bonds are funding that which is 'unfaithful' to the inalienable rights of all human beings, including the right to be free from non-consensual involuntary servitude guaranteed by Article I, Section 6 of the California Constitution;

(c) Temporarily and permanently enjoining Defendants, as well as their employees, officers, and agents, from (i) issuing or adopting any interim or final standards governing either the conduct of human embryo stem cell research and/or experimentation, the donation of human embryos for such research and/or experimentation, and/or the derivation of stem cells from living human embryos, (ii) approving or issuing any bonds (which if the necessity for default is found to lie constitutionally would result in irreparable financial loss to countless members of the public) and/or grants of state funds or monies to finance or fund human embryo stem cell research and/or experimentation projects, or (iii) undertaking any other action to encourage, assist or facilitate human embryo stem cell research and/or experimentation;

(d) Awarding Plaintiffs their costs of suit; and

(e) Granting such other relief as to this Honorable Court may seem just and equitable.

FIRST AMENDED COMPLAINT

## COUNT SEVEN

## PROPOSITION 71 VIOLATES ARTICLE I, SECTION

## 1 OF THE CALIFORNIA CONSTITUTION.

140.  Plaintiffs hereby incorporate the allegations of Paragraphs 1 through 139 of the Complaint, as if fully set forth herein at length.

141.  Proposition 71, as enacted by California electorate on November 2, 2004, insofar as it authorizes, sanctions, provides public monies for, and otherwise assists and encourages human embryo stem cell research, violates Article I, Section 1 of the California Constitution, which provides in relevant part that "*[a]ll people,* [including all human embryos *in vitro*,] are *by nature* free and independent and *have inalienable rights.*"

WHEREFORE, Plaintiffs pray for the entry of a judgment against the Defendants:

(a)  Temporarily and permanently enjoining Defendants, as well as their employees, officers, and agents, from (i) issuing or adopting any interim or final standards governing either the conduct of human embryo stem cell research and/or experimentation, the donation of human embryos for such research and/or experimentation, and/or the derivation of stem cells from living human embryos, (ii) approving or issuing any bonds and/or grant of state funds or monies to finance or fund human embryo stem cell research and/or experimentation projects, or (iii) undertaking any other action to encourage, assist or facilitate human embryo stem cell research and/or experimentation;

(b) Awarding Plaintiffs their costs of suit; and

(c) Granting such other relief as to this Honorable Court may seem just and equitable.

FIRST AMENDED COMPLAINT

## COUNT EIGHT

## PROPOSITION 71 VIOLATES ARTICLE I, SECTION
## 6 OF THE CALIFORNIA CONSTITUTION.

142. Plaintiffs hereby incorporate the allegations of Paragraphs 1 through 141 of the Complaint, as if fully set forth herein at length.

143. Proposition 71, as enacted by California electorate on November 2, 2004, insofar as it authorizes, sanctions, authorizes the issuance of bonds to finance, provides public monies for, and otherwise assists and encourages human embryo stem cell research, violates Article I, Section 6 of the California Constitution, which guarantees all human beings, including human embryos *in vito*, the right to be free from slavery and from involuntary servitude.

WHEREFORE, Plaintiffs pray for the entry of a judgment against the Defendants:

(a) Temporarily and permanently enjoining Defendants, as well as their employees, officers, and agents, from (i) issuing or adopting any interim or final standards governing either the conduct of human embryo stem cell research and/or experimentation, the donation of human embryos for such research and/or experimentation, and/or the derivation of stem cells from living human embryos, (ii) approving or issuing any bonds and/or grant of state funds or monies to finance or fund human embryo stem cell research and/or experimentation projects, or (iii) undertaking any other action to encourage, assist or facilitate human embryo stem cell research and/or experimentation;

(b) Awarding Plaintiffs their costs of suit; and

(c) Granting such other relief as to this Honorable Court may seem just and equitable.

FIRST AMENDED COMPLAINT

COUNT NINE

PROPOSITION 71 VIOLATES THE DUE PROCESS

GUARANTEE OF ARTICLE I, SECTION 7(a) OF THE

CALIFORNIA CONSTITUTION.

144.  Plaintiffs hereby incorporate the allegations of Paragraphs 1 through 143 of the Complaint, as if fully set forth herein at length.

145.  Proposition 71, as enacted by California electorate on November 2, 2004, insofar as it authorizes, sanctions, authorizes the issuance of bonds to finance, provides public monies for, and otherwise assists and encourages human embryo stem cell research, violates the due process guarantee of Article I, Section 7(a) of the California Constitution, which guarantees all "persons", including all human embryos *in vitro*,  their rights not to be deprived of life and liberty without due process of law.

WHEREFORE, Plaintiffs pray for the entry of a judgment against the Defendants:

(a)  Temporarily and permanently enjoining Defendants, as well as their employees, officers, and agents, from (i) issuing or adopting any interim or final standards governing either the conduct of human embryo stem cell research and/or experimentation, the donation of human embryos for such research and/or experi-mentation, and/or the derivation of stem cells from living human embryos, (ii) approving or issuing any bonds and/or grant of state funds or monies to finance or fund human embryo stem cell research and/or experimentation projects, or (iii) undertaking any other action to encourage, assist or facilitate human embryo stem cell research and/or experimentation;

(b) Awarding Plaintiffs their costs of suit; and

(c) Granting such other relief as to this Honorable Court may seem just and equitable.

## COUNT TEN

### PROPOSITION 71 VIOLATES THE EQUAL PROTEC-
### TION GUARANTEE OF ARTICLE I, SECTION 7(a)
### OF THE CALIFORNIA CONSTITUTION.

146.  Plaintiffs hereby incorporate the allegations of Paragraphs 1 through 145 of the Complaint, as if fully set forth herein at length.

147.  Proposition 71, as enacted by California electorate on November 2, 2004, insofar as it authorizes, sanctions, authorizes the issuance of bonds to finance, provides public monies for, and otherwise assists and encourages human embryo stem cell research, violates the equal protection guarantee of Article I, Section 7(a) of the California Constitution, which guarantees all "persons", includ-ing all human embryos *in vitro*, the right to the equal protection of the laws.

WHEREFORE, Plaintiffs pray for the entry of a judgment against the Defendants:

(a)  Temporarily and permanently enjoining Defendants, as well as their employees, officers, and agents, from (i) issuing or adopting any interim or final standards governing either the conduct of human embryo stem cell research and/or experimentation, the donation of human embryos for such research and/or experi-mentation, and/or the derivation of stem cells from living human embryos, (ii) approving or issuing any bonds and/or grant of state funds or monies to finance or fund human embryo stem cell research and/or experimentation projects, or (iii) undertaking any other action to encourage, assist or facilitate human embryo stem cell research and/or experimentation;

(b) Awarding Plaintiffs their costs of suit; and

(c) Granting such other relief as to this Honorable Court may seem just and equitable.

FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

R. Martin Palmer
Law Offices of Martin Palmer
21 Summit Avenue
Hagerstown, MD 21740
(301) 790-0640
Attorney for Plaintiffs

FIRST AMENDED COMPLAINT

# Exhibit A

EXHIBIT A

# AN
# AMERICAN DICTIONARY
## OF THE
# ENGLISH LANGUAGE;

### CONTAINING

THE WHOLE VOCABULARY OF THE FIRST EDITION IN TWO VOLUMES QUARTO; THE ENTIRE CORREC-
TIONS AND IMPROVEMENTS OF THE SECOND EDITION IN TWO VOLUMES ROYAL OCTAVO;

TO WHICH IS PREFIXED

# AN INTRODUCTORY DISSERTATION

ON THE

ORIGIN, HISTORY, AND CONNECTION, OF THE LANGUAGES OF WESTERN ASIA AND EUROPE,

WITH AN EXPLANATION

OF THE PRINCIPLES ON WHICH LANGUAGES ARE FORMED.

## BY NOAH WEBSTER, LL. D.,

Member of the American Philosophical Society in Philadelphia; Fellow of the American Academy of Arts and Sciences in Massachusetts;
Member of the Connecticut Academy of Arts and Sciences; Fellow of the Royal Society of Northern Antiquaries in Co-
penhagen; Member of the Connecticut Historical Society; Corresponding Member of the Historical Societies
in Massachusetts, New York, and Georgia; of the Academy of Medicine in Philadel-
phia, and of the Columbian Institute in Washington; and Honorary
Member of the Michigan Historical Society.

### GENERAL SUBJECTS OF THIS WORK.

ETYMOLOGIES OF ENGLISH WORDS, DEDUCED FROM AN EXAMINATION AND COMPARISON OF WORDS OF CORRESPONDING
ELEMENTS IN TWENTY LANGUAGES OF ASIA AND EUROPE.
THE TRUE ORTHOGRAPHY OF WORDS, AS CORRECTED BY THEIR ETYMOLOGIES.
PRONUNCIATION EXHIBITED AND MADE OBVIOUS BY THE DIVISION OF WORDS INTO SYLLABLES, BY ACCENTUATION, BY
MARKING THE SOUNDS OF THE ACCENTED VOWELS, WHEN NECESSARY, OR BY GENERAL RULES.
ACCURATE AND DISCRIMINATING DEFINITIONS, ILLUSTRATED, WHEN DOUBTFUL OR OBSCURE, BY EXAMPLES OF THEIR
USE, SELECTED FROM RESPECTABLE AUTHORS, OR BY FAMILIAR PHRASES OF UNDISPUTED AUTHORITY.

## REVISED AND ENLARGED,

### BY CHAUNCEY A. GOODRICH,

PROFESSOR IN YALE COLLEGE.

PRONOUNCING VOCABULARIES OF SCRIPTURE, CLASSICAL, AND GEOGRAPHICAL NAMES.

## SPRINGFIELD, MASS.

PUBLISHED BY GEORGE AND CHARLES MERRIAM,
CORNER OF MAIN AND STATE STREETS.

1857.

| BOR | BOR | BOS |

**BOR** (left column)

East Indies, where it is said to be found at the bottom or on the margin of certain lakes, particularly in Thibet. It is said to be artificially prepared in Persia, like niter. It comes in three states. 1. Crude borax, tincal, or chrysocolla, from Persia, in greenish masses of a greasy feel, or in opaque green crystals. 2. Borax of China, somewhat purer, in small plates or masses, irregularly crystallized, and of a dirty white. 3. Dutch or purified borax, in portions of transparent crystals, which is the kind generally used. It is an excellent flux in docimastic operations, and useful in sodering metals. *Hooper.*

**BORDO-RYCAL** (bor'do-rim.) *n.* [Spanbarygal, a rumbling.] A rumbling noise of wind in the bowels.

**BORDAGE,** *n.* See Bordulands. [*Todd.*]

**BOR-DEL,** *n.* [Fr. bordel, a brothel; D. bordeel; Arm. bordell; from bord, a house. This is the English.]

A brothel; a bawdy-house; a house devoted to prostitution.

**BOR'DEL-LER,** *n.* The keeper of a brothel. *Gower.*

**BORDER,** *n.* [Fr. and Arm. bord; Sp. borde; Port. borda; It. bordo. See Board.]

The outer edge of any thing; the extreme part or surrounding line; the confine or exterior limit of a country, or of any region or tract of land; the exterior part or edge of a garment; the rim or brim of a vessel, but not often applied to vessels; the exterior part of a garden, and bank raised at the side of a garden for the cultivation of flowers, and a row of plants; in short, the outer part or edge of things too numerous to be specified.

In botany, the limbus or upper spreading part of a monopetalous corol.

**BORDER,** *v. i.* To confine; to touch at the edge, side, or end; to be contiguous or adjacent; with on or upon. As, Connecticut, on the north, borders on or upon Massachusetts.

2. To approach near to.

*We, which borders upon probableness deserves to be branded as such.* *Tillotson.*

**BORDER,** *v. t.* To make a border; to adorn with a border of ornaments; as, to border a garment or a garden.

2. To reach to; to touch at the edge or end; to confine upon; to be contiguous to.

*Sheba and Raamah border the Persian Gulf. Raleigh.*

3. To confine within bounds; to limit. [*Not used.*] *Shak.*

**BORDER-ED,** *pp.* Adorned or furnished with a border.

**BORDER-ER,** *n.* One who dwells on a border or at the extreme part or confines of a country, region, or tract of land; one who dwells near to a place. *Bacon.*

**BORDER-ING,** *ppr. or a.* Lying adjacent to; forming a border.

**BORD-HALFPEN-NY,** (bord-hap'pen-ny,) *n.* Money paid for setting up boards or a stall in market. *Bacon.*

**BORD-LAND,** *n.* [bord and land. See Board.] In old law, the demain land which a lord kept in his hands for the maintenance of his bord, board, or table.

**BORD-LODE,** *n.* [bord and land.] The service required of a tenant to carry timber from the woods to the lord's house; also, the quantity of provision paid by a bord-man for bord-land. *Bailey.*

**BORD-LOAD.** See Bord-Lode.

**BORD-MAN,** *n.* [bord and man.] A tenant of bord-land, who supplied his lord with provisions. *Encyc.*

**BORD-RAG-ING,** *n.* An incursion upon the borders of a country. [*Obs.*] *Spenser.*

**BORD-SERV-ICE,** *n.* [bord and service.] The tenure by which bord-land was held, which was the payment of a certain quantity of provisions to the lord. In lieu of this, the tenant now pays sixpence an acre. *Encyc.*

**BORD'URE,** *n.* In heraldry, a tract or compass of metal, color, or fur, within the escutcheon and around it.

**BORE,** *v. t.* [Sax. borian; Sw. bora; D. booren; Ger. bohren; Dan. borer, to bore; D. boor; Ger. bahrer; Dan. borer, a borer; L. foro, and perforo, to bore, to perforate; Russ. burau, a borer; Gr. φαρω, to pierce or transfix; also, to pass over, in which sense it coincides with ferry. The Celtic bir, beor, a spit, L. veru, from thrusting or piercing, coincide in elements with this root. Pers. بر bīrak, a bore.]

1. To perforate or penetrate a solid body, and make a round hole, by turning an auger, gimlet, or other instrument. Hence, to make hollow; to form a round hole; as, to bore a cannon.

2. To eat out or make a hollow by gnawing or corroding, as a worm.

3. To penetrate or break through by turning or labor, as, to bore through a current. *Gay.*

4. To weary by tedious iteration.

**BORE,** *v. i.* To be pierced or penetrated by an instrument that turns; as, this timber does not bore well, or is hard to bore.

**BOR** (middle column)

2. To pierce or enter by boring; as, an auger bores.

3. To push forward toward a certain point. [well.

*Boring to the west. Dryden.*

4. With horsemen, a horse bores, when he carries his nose to the ground. *Dict.*

5. In a transitive or intransitive sense, to penetrate the earth by means of a chisel or other cutting instrument, withdrawing the dust and fragments, at intervals, by means of a scooping-iron or other appropriate instrument, for the purpose of ascertaining the presence of minerals, as veins of ore or beds of coal, or for obtaining springs of water, as in Artesian wells, or fountains of salt water, &c.

**BORE,** *n.* The hole made by boring. Hence, the cavity or hollow of a gun, cannon, pistol, or other fire-arm; the caliber, whether formed by boring or not.

2. Any instrument for making holes by boring or turning, as an auger, gimlet, or wimble.

3. A person or thing that wearies by iteration.

**BORE,** *n.* A tide swelling above another tide. *Burke.* A sudden influx of the tide into a river or narrow strait, conflicting with the water from above. *Cyc.*

**BORE,** pret. of Bear. [See Bear.]

**BORE-COLE,** *n.* A variety of cabbage, whose leaves are not formed into a compact head, but are loose, and generally curled or wrinkled. *Fam. of Plants.*

**BORE-AL,** *a.* [L. borealis. See Boreas.] Northern; pertaining to the north or the north wind. *Pope.*

**BORE-AS,** *n.* [L. boreas; Gr. βορεας, the north wind; Russ. buryu, a storm or tempest; buran, a tempest with snow. The Russ. gives the radical sense.] The northern wind; a cold, northerly wind. *Milton.*

**BOR-EE,** *n.* (bor'e.) *n.* Perforated by an auger or other turning instrument; made hollow; wearied by tedious iteration.

**BOR-EE,** *n.* [Fr.] A certain dance, or movement in common time, or four crotchets in a bar; always beginning in the last quarter or last crotchet of the measure. *Busby.*

**BORER,** *n.* One who bores; also, an instrument to make holes with by turning.

2. Teredula, the piercer, a genus of sea worms. *Humble.*

**BORING,** *n.* 1. The act of boring; a place made by boring.

2. The chips made by perforating a body are called borings.

**BORING,** *ppr.* Perforating by an auger or other turning instrument; making hollow; wearying by tedious iteration.

**BORN,** (bawrn,) *pp. of Bear.* Brought forth, as an animal. A very careful distinction is observed by good writers, who, in the sense of produced or brought forth, spell this word born; but, in the sense of carried, write it borne. This difference of orthography renders obscure the difference of pronunciation.

1. To be born, is to be produced or brought into life. "Man is born to trouble." A man born a prince or a beggar. It is followed by of before the mother or ancestors.

*Man, that is born of woman, is of few days and full of trouble.—Job xiv.*

2. To be born, or born again, is to be regenerated and renewed; to receive spiritual life. John iii.

**BORNE,** *pp. of Bear.* Carried; conveyed; supported; defrayed.

**BORNITE,** *n.* The telturite of bismuth. *Dana.*

**BOR-OUGH,** *n.* The radical or elementary base of boracic acid. *Parke.*

**BOR-OUGH,** (bur'ro,) *n.* [Goth. baurgs; Sax. burg, burh, beorh, borough; G. berg; Fr. bourg; It. borgo; Sp. burgo; D. burg and berg; Dan. borg; Arm. bourg; Gr. πυργος; Ch. צרכוי; Ar. بروج bourchon; Sans. bura. This word, in Saxon, is interpreted a hill, heap, mountain, fortification, castle, tower, city, house, and tomb. Hence Pergu in Pamphylia, Bergen in Norway, Bergen in Spain, and probably Prague in Bohemia. In W. bar, bore, signifies a wall, rampart, or work for defense, and bwrdais is a burgess. But the original sense probably is found in the verb Sax. beorgan, D. and G. bergen, Russ. beregu, to keep, or save, that is, to make close or secure. Hence it coincides with park, and L. parcus, saving. (See the next word.) If the noun is the primary word, denoting hill, this is from throwing together, collecting; a sense allied to that of making fast or close.]

Originally, a fortified city or town; hence, a hill, for hills were selected for places of defense. But in later times, the term city was substituted to denote an episcopal town, in which was the see of a bishop, and that of borough was retained for the rest. At present, the name is given appropriately to such towns and villages as send representatives or burgesses to parliament. Some boroughs are incorporated, others are not. *Blackstone. Encyc.*

In Connecticut, this word, borough, is used for a town, or a part of a town, or a village, incorporated with certain privileges, distinct from those of other towns and of cities.

**BOS** (right column)

In Scotland, a borough is a body corporate, consisting of the inhabitants of a certain district, erected by the sovereign, with a certain jurisdiction. Boroughs are erected to be held of the sovereign, as in general; the case of royal boroughs; or of the superior of the lands included, as in the case of boroughs of regality and barony. Royal boroughs are generally erected for the advantage of trade. *Encyc.*

**BOR-OUGH,** (bur'ro,) *n.* [Sax. borhoe, a surety; borgian, to borrow; beorh, defence; burg, a surety; burgi, a pledge; beorg-bryce, a surety; a plege; burg-bryce, burg-breck, violation of pledge; borghand, borhhand, a surety or bail; beorgan, to keep, guard, or preserve; G. and D. burgen, to borrow. See the preceding word.]

In Saxon times, a main pledge, or association of men, who were sureties or free pledges to the king for the good behavior of each other, and if any offense was committed in their district, they were bound to have the offender forthcoming. The association of ten men was called a tithing or decennary; the presiding man was called the tithing-man or head-borough, as, in some places, borsholder, borough's elder. This society was called, also, friborg, freeburg, frank-pledge. Ten tithings formed a hundred, consisting of that number of sureties, and this association is still given to the districts comprehended in the association. The term seems to have been used both for the society and for each surety. The word main, borh, which is attached to this society, or their mutual assurance, indicates that the agreement was ratified by shaking hands. *Spelman. Blackstone. Cowel.*

Some writers have suggested that the application of this word to towns sprung from these associations, and of course was posterior to them in time. [*See Encyc., art. Borough.*] But the word was used for a town or castle in other nations, and in Asia, doubtless long before the origin of the frank-pledge.

**BOR-OUGH ENGLISH;** a customary descent of lands and tenements to the youngest son, instead of the eldest; or, if the owner leaves no son, to the youngest brother. *Blackstone. Cowel.*

**BOR-OUGH HEAD;** the same as Head-Borough, the chief of a borough.

**BOR-OUGH HOLDER,** *n.* A head-borough; a borsholder.

**BOR-OUGH-MAS-TER,** *n.* The mayor, governor, or bailiff of a borough. *Ash.*

**BOR-OUGH-MONGER,** (bur'ro-mung'ger,) *n.* One who buys or sells the patronage of a borough. *Smart.*

**BOR-REL,** *n.* Rustic; rude. *Spenser.*

**BOR'ROW,** (bor'ro,) *v. t.* [Sax. borgian, to borrow; D. borgen, to borrow, lend, or trust; Ger. borgen, the same; Dan. borge, to borrow; borgen, bail, surety, pledge, warrantry, main-pernor; borg, trust, credit; Sw. borgen, a giving bail; borg, a fortress. The primary sense is, to make fast or secure.]

1. To take from another by request and consent, with a view to use the thing taken for a time, and return it, or, if the thing taken is to be consumed or transferred in the use, then to return an equivalent in kind; as, to borrow a book, a sum of money, or a loaf of bread. It is opposed to lend.

2. To take from another, for one's own use; to copy or select from the writings of another author; as, to borrow a passage from a printed book; to borrow a title.

3. To take or adopt, for one's own use, sentiments, principles, doctrines, and the like; as, to borrow an instruction.

4. To take for me something that belongs to another; to assume, copy, or imitate; as, to borrow a shape; to borrow the manners of another, or his style of writing.

**BOR'ROW,** *n.* A borrowing; the act of borrowing. [*Not used.*]

*But of your royal presence I'll adventure The borrow of a week. Shak.*

**BOR'ROW-ED,** *pp.* Taken by consent of another, to be returned, or its equivalent in kind; copied; assumed.

**BOR'ROW-ER,** *n.* One who borrows; opposed to lender. [See the verb.]

2. One who takes what belongs to another to use as his own.

**BOR'ROW-ING,** *ppr.* Taking by consent, to use and return, or to return its equivalent; taking what belongs to another, to use as one's own; copying; assuming; imitating.

**BOR'ROW-ING,** *n.* The act of borrowing. [See the verb.]

**BORS'HOLD-ER,** *n.* [A contraction of buhr's ealder, borough's elder, the elder or chief of a borough.] The head or chief of a tithing, or borg of ten men; the head-borough. *Lambard. Spelman.*

**BORU-RET,** *n.* A combination of boron with a simple body.

**BOS,** *n.* [L.] In zoölogy, the technical name of a genus of quadrupeds. The characters are, the horns are hollow within, and turned outward, in the form of crescents; there are eight fore teeth in the under jaw, but none in the upper; there are no dog teeth.

# Exhibit B

EXHIBIT B

# IN THE CIRCUIT COURT FOR BLOUNT COUNTY
## STATE OF TENNESSEE
### AT MARYVILLE, TENNESSEE

JUNIOR L. DAVIS,
    *Plaintiff*,

vs.                              No. E-14496

MARY SUE DAVIS,
    *Defendant*.

    Transcript of excerpt of proceedings as had upon the trial of the above-styled cause before the Honorable William Dale Young, on the 10th day of August, 1989.

Reported by:
PEGGY M. GILES, C.C.R.
KNOXVILLE COURT REPORTING
P.O. Box 9112
Knoxville, Tennessee 37940
615-573-9300

APPEARANCES:
    FOR THE PLAINTIFF:
    Charles Clifford
    Attorney at Law
    117 E. Broadway
    Maryville, Tennessee

    FOR THE DEFENDANT:
    J. G. Christenberry
    Attorney at Law
    9th Floor
    603 Main Avenue
    Knoxville, Tennessee

8

THE COURT: For the record, ladies and gentlemen, let the record reflect that prior to these proceedings being placed of record, that the Honorable Martin Palmer, a member of the Maryland Bar, had been introduced to the Court and welcomed, and that Dr. Lejeune, a witness in this case, had been given the oath to testify. Is there any need, gentlemen, to readminister the oath for the record?

MR. CLIFFORD: No, your Honor.
MR. CHRISTENBERRY: No; your Honor.
THE COURT: You may proceed.

The Witness,
**JEROME LEJEUNE, M.D.,**
having been first duly sworn, testified upon his oath as follows:

DIRECT EXAMINATION
BY MR. CHRISTENBERRY:
Q. Would you state your name for the record, please, sir?
A. My name is Jerome Lejeune.
Q. And to help the court reporter if she doesn't understand the French pronunciation you spell your name, J-E-R-0-M-E, capital L, little e, little j, E-U- N-E?
A. Perfect.
Q. Thank you. Dr. Lejeune, from your accent, I take it that you live elsewhere than East Tennessee?
A. Well, born on the river of the Seine, you know.
Q. And that is probably situated in another country, I hope?
A. It's a little country called France, and the little town is Paris.
Q. Thank you, Doctor. I guess you're a French citizen?
A. I'm French citizen, Parisian born.
Q. And you've traveled to this country, to Maryville Tennessee, to offer what you have as a witness in this trial?
A. Yes.
Q. Okay. Tell us, Doctor, What you do, what your profession is.
A. I am a M.D., that is Doctor in medicine, I'm also a Ph.D., Doctor in science, and after getting my degree in the University of Paris in medicine and also in genetics in the Sorbonne, Faculty of Science, I was research worker for ten years, and then I was appointed professor of fundamental genetics in the Faculty of Medicine of Paris. My special field is children, all the constitutional diseases of children, and more especially mental retardation.
Q. Okay. Doctor, you practiced medicine, I take it, as maybe a pediatrician?
A. Well, I started as a pediatrician, but I specialized In genetics, and we have the biggest consultation of the world in l'*Hospital des Enfants Malades*, Sick

9

2

Children Hospital in Paris. We have the biggest consultation of the world for children with mental retardation due to congenital diseases due to chromosomal mistakes.

Q. Have you been an educator as a result of your background? Have you been a teacher?

A. Well, I have been professor of fundamental genetics now for twenty years, but I began my first teaching was not in France, it was in America. I was invited by Professor Beadle in Caltech, California Institute of Technology. It was just before I discovered the first diseases of man—first chromosomal diseases in man, but I was already involved in medical genetics, and Beadle invited me to give the first course of human genetics in Caltech. That was long ago. At that time my English was even rougher than it is today, and I came with all my course written in French. In the evening I was translating them with the dictionary, and in the morning I was delivering the course to the students. They were very kind, they helped me very greatly. That is the way I have learned to speak English, and I hope the way they have learned a little about human genetics.

Q. You remember the year that you went to Caltech?

A. Well, it was in '58.

Q. Did you remain there for some time as a professor?

A. I was a visiting professor from the OTAN, professorship from the OTAN; NATO, you say NATO, excuse me.

Q. You have been accredited with helping in human genetics with identification of some chromosome; will you tell us what that is about?

A. It happens that I discovered the first disease due to a chromosomal mistake in man which is Down's Syndrome which was called previously Mongolism because these children have a special odd look which is a little remembering for European some type of the Mongol features. But in Mongolia they don't like to call the disease Mongolism, they call it European Imbecility.

I discovered that they had one chromosome too much. That was long ago, thirty-two years, if I calculate well, and for that discovery I received the Kennedy Prize from the late president here in United States. And also for that discovery, I got William Allen Memorial Award which is the highest award that you can get in genetics in the world. It's given also in United States.

Q. I see. Have you followed with your genetic discovery even as you sit here today? Have you continued to study?

A. Oh, yes.

Q. Could you probably give us an enlightenment on what's happened over thirty-two years?

A. Well, I want not to speak too much about myself, it's not the subject. But we have discovered ten different diseases due to chromosomal errors, and I would say the first chapters of this enormous pathology was written in French by us. Now, we are dealing with mechanisms of mental retardation due to chromosomal diseases, and we are beginning to understand why having one

10

chromosome too much, that is, normal information but repeated, makes a nuisance for the development of the intellect. And, for example, very recently we demonstrated that in trisomy twenty-one, Down's Syndrome, previously called Mongolism, the cells of the children are more sensitive to some drugs which are used against cancer. It seems totally unrelated, but, in fact, it's defining a new field of research, because very likely this peculiarity is related to a deficiency in a chemical system which is used especially in our neuron, and it's probably one of the main reasons why they do not develop a normal intelligence. So, for the moment, you asked me what we are doing now: We are working on this particular hypothesis because it allows us to make experiments on cells, taken from the children, we cultivate, and we can manipulate, we deprive them, we follow them and we play with them, and we use a lot of drugs to see how they react, and that is the first time we can make experiment in human cells so that to try to cure a neuronal disease, a nervous disease, so it's a very exciting field, but the job is not yet finished.

Q. I trust you can do all that without harming the children?

A. Oh, well, you just take a few drops of blood, and you cultivate the cells, make cultures. We play with the cell: we do not play with the child.

Q. Thank you, Doctor. I understand you're on the boards of various academies in this world. Could you tell us about that?

A. I have the honor of being a member of the American Academy of Arts and Science, I'm member of the Royal Society of Medicine in London, Royal Society of Science in Stockholm, of the Science Academy in Italy, in Argentina. I'm a member of the Pontifical Academy of Science, and I'm a member in Paris in the *Institut de France of the Academie des Sciences Morales et Politiques*, that is, of Moral and Political Sciences, a special academy in France; and also the Academy of Medicine in France.

Q. The Academy that deals with moral and political sciences—

A. Yeah.

Q. Tell us what that academy's function is about, doctor.

A. That academy was made around two hundred years ago to give advice to the government about moral and political questions, and essentially to give advice to the government about the use of new techniques, considering that the respect of man is one of the bases of our constitution. We have five academies in the Institute de France, it's, one of them.

Q. And then you mentioned another that gave me some interest. You said the Pontifical Academy, where is that academy located?

A. The Pontifical Academy of Science is located inside the gardens of the Vatican, a very nice location. We are seventy members and no more than seven of any country, so that we're coming from all the world around. Our percentage of Nobel Prize is more than sixty percent. There is no difficulty because we choose the members in the whole earth, and so it's not difficult to choose good ones. The interest is many of them have been selected by another committee

11

4

long after they had been elected by our academy. I would say it's the only scientific international academy of science, the only one which is truly international.

Q. How long have you been on that academy?

A. Twelve years if I remember well, something like that.

Q. Tell us a little bit about the topics or research that is done there. What have you all considered?

A. In the academy?

Q. Yes, sir.

A. Well, for example, we are given the question: What is danger of the use of atomic energy? For example, we had four sessions about the danger of atomic weapons and their numbers, the use of them, the possibility of survival of humanity after an atomic war and how medicine could do something. And when we did the report, the Holy Father asked the academy to designate members to produce that report to the powers who head the atomic power. I was sent to-in Moscow, to the late Mr. Brezhnev. This was a very interesting interview during one hour discussing with Mr. Brezhnev in the Kremlin about the danger that humanity would feel if there was an atomic exchange.

Q. Did you find that interview interesting to say the least with Mr. Brezhnev?

A. I'm not a diplomat, I'm just a scientist, and it was very interesting for me, at least.

Q. I understand that in this country, you're familiar with our man that is in charge of our health and welfare of all the citizens of this state?

A. C. Everett Koop, yes, we are good friends. I know him since long.

Q. How long have you known him now?

A. I'm not good at counting the number of years, I know people-maybe fifteen years, something of that kind.

Q. Do you visit with him and speak with him?

A. Yes.

Q. Does he call your bureau or your agency or your scientific—on the phone in Paris?

A. No, we have discussions when we meet together. We don't use phone for very important matter. It's better to have a chat.

Q. What are his interests in you? In other words, what areas have you all chatted about?

A. Human genetics, which is my field.

MR. CHRISTENBERRY: I believe at this time, your Honor, I would ask the Court to recognize Dr. Lejeune as an expert witness in the field in which he's here to testify.

THE COURT: Any objection?

MR. CLIFFORD: Your Honor, we certainly recognize Dr. Lejeune's expertise in the field of genetics.

THE COURT: All right, he's qualified.

MR. CHRISTENBERRY: Thank you, your Honor. BY MR. CHRISTENBERRY:

Q. Dr. Lejeune, as you sit here today, it's fair to say you have come quite a distance, is it not, sir?

A. Pardon!

Q. It's fair to say you have come quite a distance to testify today, is it not?

A. Well, it's not that far, you know. I have been farther than that.

Q. You're familiar with the issues, the profound issues this Court is considering, aren't you, Doctor?

A. Yeah, and that is the reason why I accepted to come.

Q. Thank you. With respect to the issues in this case, you understand the-what we would say is the factual understanding of how Mr. Davis feels and how Mrs. Davis feels. There has been some publicity about this, has there not, Doctor? You have heard something about their dilemma?

A. I heard something, but very little. I must be very honest, I don't look at television, I don't listen to the radio, and I only knew when Mr. Palmer telephoned to me, that was the first time I heard about it. So I would not say I'm really knowing the whereabouts, no. I know there are babies, there are human beings in the fridge, this is the only thing I know.

Q. Thank you, Doctor. So let's start with that aspect of this case. You're familiar with in vitro fertilization?

A. Yes.

Q. When did you write your first article about it, if you recall?

A. Oh, you are terrible with dates; I'm not good with the answers. It must be fifteen years ago, something.

Q. Okay.

A. Before it was used.

Q. Before it was used. So before it was used it had been conceived in man's mind, had it not?

A. Well, you have to understand that artificial fertilization is something rather old in biology, and it was used for animals long before it was applied to man. And what seems today extraordinary, that is freezing a human embryo, it was not extraordinary for a cow. There is a lot of time that cows have been frozen and used and sent by air mail in little containers. And the novelty is to consider that the technique which was devised for husbandry was good enough for mankind.

Q. Tell us about in vitro fertilization and your view of it and your perspective that you could offer today.

A. Well, could I speak more about nature—

Q. Yes.

A. —of the human being, than specifically the condition in vitro, because to understand what means the fertilization in vitro, we have to understand what

13

6

means fertilization at the beginning of a human being.

Q. All right.

A. And if I can say so, I would say that life has a very long history, but each of us has a unique beginning, the moment of conception. We know and all the genetics and all the zoology are there to tell us that there is a link between the parents and the children. And this link is made of a long molecule that we can dissect the DNA molecule which is transmitting information from parents to children through generations and generations. As soon as the program is written on the DNA, there are twenty-three different pieces of program carried by the spermatozoa and there are twenty-three different homologous pieces carried by the ovum. As soon as the twenty-three chromosomes carried by the sperm encounter the twenty-three chromosomes carried by the ovum, the whole information necessary and sufficient to spell out all the characteristics of the new being is gathered.

Q. Is what, sir?

A. Gathered.

Q. Gathered.

A. Gathered. And it's very interesting, if I can say, your Honor, to remark that natural sciences and science of the law, in fact, speak the same language. In that sense that when we see somebody healthy, well built, we say he has a robust constitution, and when we see a country in which every subject is protected by the law, we say it has an equitable constitution. In the phenomenon of the writing a law, you have to spell out every term of the law before it can be considered to be a law, I mean in the science of the law. And secondarily, this information written in the law has to be enacted, and it cannot be before it has been voted for.

Now, life does exactly the same thing. Inside the chromosomes is written the program and all the definitions. In fact, chromosomes are, so to speak, the table of the law of life. If you get the right number of your table of the law of your life, then you begin your own life. Now, the voting process does exist as well. It is the fertilization itself, because there are a lot of proposals, many, many sperms. Only one got in; that is the voting process which enact the new constitution of a man. And exactly as would say a lawyer, once a constitution exists in a country, you can speak about it in the same way, when this information carried by the sperm and by the ovum has encountered each other, then a new human being is defined because its own personal and human constitution is entirely spelled out.

There exists a lot of minute differences in the message given by father and the one given by mother, even by the same person; we do not give exactly the same minute information in each sperm or in each egg. It follows that the voting process of the fertilization produces a personal constitution which is entirely typical of this very one human being which has never occurred before and will never occur again. It's an entire novelty. That was sure—that was

14

7

known for let's say not a hundred years but more than fifty years. But the bewildering was the minuteness of the writing of those tables of the law.

You have to figure out what is a DNA molecule. I would say it's a long thread of one meter (sic) of length, cut in twenty-three pieces. Each piece is coiled on itself very tightly to make spiral of spiral of spiral so that finally it looks like a little rod that we can see under the microscope that we call a chromosome. And there are twenty-three of them carried by father, twenty-three of them carried by mother. I said the minuteness of the language is bewildering because if I was bringing here in the Court all the one meter long DNA of the sperms and all the meter long of the ovums which will make every one of the five billions of human beings that will replace ourselves in this planet, this amount of matter would be roughly two aspirin tablets. That tells us that nature to carry the information from father to children, from mother to children, from generation to generation has used the smallest possible language. And it is very necessary because life is taking advantage of the movement of the particles, of molecules, to put order inside the chance development of random movement of particles, so that chance is now transformed according to the necessity of the new being.

All the information being written they have to be written in the smallest language possible so that they can dictate how to manipulate particle by particle, atom by atom, molecule by molecule. We have to be with life at the real cross between matter, energy and information.

Now, I would like, your Honor, to give you an impression of what happens normally. Most of the human beings have been conceived before the fertilization in vitro was used, and most of the humanity will still be made the old good days' fashion for a long time I do hope. Normally, when the ovum is ripe, that is, once a month, fifteen days after the menses, there is a rupture of the follicle, and the ovum is so to speak taken by the fallopian tube, which has a special expansion—we call it *le pavillon*—I don't know the name in English. And it can move, and if you take a picture it looks like as a hand making a slow palpation of the ovary to find where the egg will be laid and to take it.

Normally, the egg is a big cell, round, not mobile, floating quietly inside the fluid in the tube, and the tube will manage to carry this big cell towards the uterus by ciliate movements. On the contrary, the sperm is an indefatigable navigator. It has been deposited in the entry of the genitalia of the mother, and normally it goes up through the cervix of the uterus, he swims during the whole uterine cavity, and it is inside the fallopian tube that the encounter between few thousands, ten thousands, hundred thousands of sperm and the one egg can occur. And it is because every human being has been conceived in nature inside the little tube, a tube of flesh that we call the fallopian tube, that test tube babies are indeed possible. The only difference is that sperm and egg are meeting inside a tube which is now a tube of glass because the egg has been removed from the body of the woman, and the sperm has been just added to the little vessel. And it's because normal *fecundation*—I should say fertilization in

15

8

English—normal fertilization is occurring inside a tube that if you put the proper medium … It is not at all the inseminator who makes fertilization, he just puts on the right medium, a ripe ovum, active sperm, and it is the sperm who made the fertilization. Man would be unable to make a fertilization. It has to be done directly by the cells. And it's because they were normally floating in the fluid that this extracorporeal technique is at all possible.

Now, the reproduction process is a very impressive phenomenon in the sense that what is reproduced is never the matter, but it is information. For example, when you want to reproduce a statue, you can make a mold and there will be an exact contiguity between the atoms of the original statue and the atoms of the mold. During the molding process there will be again between the plaster and the mold contact atom by atom so that you reproduce the statue. But what is reproduced is not the original because you can make it out of plaster, out of bronze, about anything. What is reproduced is the form that the genius of the sculptor had imprinted in the matter. The same thing is true for any reproduction whether it is by radio, by television, by photography, what is printed or reproduced is the information and not the matter. The matter is a support of the information. And that explain to us how life is at all possible, because it would be impossible to reproduce matter. Matter is not living, matter cannot live at all. Matter is matter. What is reproduced and transmitted, it's an information which will animate matter. Then there is nothing like living matter, what exist is animated matter. And what we learn in genetics is to know what does animate the matter, to force the matter to take the form of a human being.

To give you an idea, I would take a very simple example, I would take the example of this little apparatus here, a recorder.

Q. Yes, sir.

A. Now, chromosomes are a long thread of DNA in which information is written. They are coiled very tightly on the chromosomes, and, in fact, a chromosome is very comparable to a mini-cassette, in which a symphony is written, the symphony of life. Now, exactly as if you go and buy a cartridge on which the *Kleine Nachtmusik* from Mozart has been registered, if you put it in a normal recorder, the musician would not be reproduced, the notes of music will not be reproduced, they are not there; what would be reproduced is the movement of air which transmits to you the genius of Mozart. It's exactly the same way that life is played. On the tiny minicassettes which are our chromosomes are written various parts of the opera which is for human symphony, and as soon as all the information necessary and sufficient to spell out the whole symphony, this symphony plays itself, that is, a new man is beginning his career.

In vitro fertilization does not change at all what I have said. It's just a technique sometime used to bypass a difficulty in the encounter of the egg and the sperm, so it's a–it's a derivation. It does not change at all the basic mechanism, the basic mechanism is just the same.

Now, if I could continue a little more, it's not about fertilization that we are

16

9

discussing. It's about freezing of embryos. I'm not a specialist at freezing embryos. Your Honor, I have never played with embryos. But in my laboratory we are freezing cells, we are thawing them, we are using a lot of those process, so we know about it, we use it on another system than embryos, but all cells are very similar in their reactions. Now, you have to realize —I don't know if it is true in English, but I think it's quite true, and it is true at least in all the Latin language, we use the same word to define the tempo that we measure with a clock and the temperature that we measure with a thermometer. We say in French *temps* and *temperature*; in English you say time which is a change of tempo, which a temporal thing, and temperature. And that is not a mistake of the ordinary language, it's a definition of the basic phenomenon. I don't know how they have recognized it so long ago to build it into the language. What means "time" is the flux of the agitation of the molecule, the flux of the particle which is continually going on. And temperature is just a measure of the speed with which the molecules are running in a given medium.

Now, if you diminish progressively temperature, you diminish the speed and the number of collisions between the molecules, and so to speak without any joke about the words, you are progressively slowing down, slowing down the temperature, you are freezing time. And, in fact, we are wrong telling that we are freezing embryos. In a sense it's very true like you deep freeze the meat in the supermarket, very correct. But in the fundamental sense what we are doing by lowering down the temperature is stopping not totally but very deeply the movements of the atoms and molecule so, in fact, inside the can, the thermal can in which we put in tiny canisters the cells or the embryos, we have more or less arrested the flux of the time. This seems to be rhetorical, but it is not because otherwise we could never understood why it is possible to freeze a cell, to have it entirely not moving, not respirating, not having any chemical exchange, and just if you have done it with precision (so that no crystals have been made inside the cells which could have ruptured its very minute architecture), if you thaw it, thaw it progressively and carefully, it will again begin to flourish and to divide. Then it's obviously sure that we have not arrested life and started life again. What we have arrested is the time for this particular organism which is inside this can.

If we could put a cell down to the minus two hundred seventy-three centigrade, that is, to the absolute zero, every movement would be stopped. And if the temperature would be maintained at that level, it would be kept unchanged for indefinity. I would not say eternity but indefinity. We are not achieving that when we freeze a cell in my laboratory (and you do the same here); we use not liquid hydrogen because it's very costly and very explosive, and it's used only in NASA for the rockets. We use mostly liquid nitrogen because it cannot explode, and it's rather cheap, and it's easy to manage. But it's only minus a hundred ninety degrees that we have inside the cannister. Well, it's rather cool, but it's not absolute zero, so the preservation is not a hundred

*Absolute zero =*
*−273.15° C*
*or*
*−459.67° F*

17

10

percent.

And probably you could not preserve the cells for more than a number of years, that nobody knows because it depends on the cells. For example, to the best of my knowledge for ordinary cells which are very resistant, they are examples of more than fifteen years in the cannister and being thawed and being correctly surviving and alive. For mouse embryo it's some ten years. In our species I think there are no long time, maybe one or two years, no more than that. And nobody knows with the actual technique how long the preservation would be real preservation. It's a question I could not answer, and I think nobody can answer precisely today.

But what I could say, that the information which is inside this first cell obviously tell to this cell all the tricks of the trade to build herself as the individual, this cell is already. I mean it's not a definition to build a theoretical man, but to build that particular human person we will call later Margaret or Paul or Peter, it's already there, but it's so small that we cannot see it. It's by induction that we know it for the moment. And I would say I would like to use the felicitous expression of the mathematicians. They would say that man is reduced at its simplest expression like you can do with an algebraic formula if you manipulate it intelligently. If you want to know what mean that formula you have to expand it to give value to the various parameters, and to put in use a formula, you expand it. It's what is life, the formula is there; if you allow this formula to be expanded by itself, just giving shelter and nurture, then you have the development of the full person. Now, I know that there has been recent discussion of vocabulary, and I was very surprised two years ago that some of our British colleagues invented the term of pre-embryo. That does not exist, it has never existed. I was curious, and I went to the encyclopedia, to the French encyclopedia, the one I inherited from my great father so it was fifty years ago it was printed.

And at the term of embryo it was said: "The youngest form of a being," which is very clear and simple definition, and it stated: "it starts as one fertilized cell, (fertilized egg which is called also zygote), and when the zygote splits in two cells, it is called a two-cell embryo. When it split in four it is called a four-cell embryo." Then it's very interesting because this terminology was accepted the world over for more than fifty years by all the specialists of the world, and we had no need at all of a sub-class which would be called a pre-embryo, because there is nothing before the embryo. Before an embryo there is a sperm and an egg, and that is it. And the sperm and an egg cannot be a pre-embryo because you cannot tell what embryo it will be, because you don't know what the sperm will go in what an egg, but once it is made, you have got a zygote and when it divides it's an embryo and that's it.

I think it's important because people would believe that a pre-embryo does not have the same significance that an embryo. And in fact, on the contrary, a first cell knows more and is more specialized, if I could say, than any cell which

18

11

is later in our organism.

Now, I don't know if I can abuse of your patience, your Honor?

THE COURT: You're doing fine.

THE WITNESS: The very young human being, just after fertilization, after it has split in two cells and then in three cells because curiously we do not split ourselves in two, four, eight and continue like that, no, at the beginning we don't do that. We split in two cells of roughly equal dimension and one of the two cells splits in two. There is a moment in which inside the zona pellucida which is a kind of plastic bag, which is, so to speak, the wall of the private life of the embryo in which it is protected from the outside, we have a stage in which there are three cells. This has been known for fifty, sixty years, and it was remaining a mystery for embryology, because after that stage of three cells, it starts again, it comes to four, and it continue by multiples of two.

What could be the meaning? We do not know yet the accurate meaning, but it is of great importance about the discussion we have today because we can manipulate non-human embryos like, for example, mices. We can disassemble the cells which are inside the zona pellucida of a sixteen cell embryo of mice and take few cells of it, take few cells from another embryo, of another type of embryo, if you wish, and put all that together inside a new zona pellucida from which you have expelled the legitimate occupant. Now, what happens? Most of the time it fails, but sometimes a chimera comes out. For example, if you have chosen a black embryo, a white embryo and you have mixed them together, you find a little tiny mouse which can run on your table but which has a chessboard on the body. Parts are black, parts are white because she has built herself of two type of cells that you had put together in the same zona pellucida. It has to be done with a very small number of cells.

We have tried, and when I say we, I should say geneticists, have tried to put three different lines, and they have got few mice with three different type of cells that they can see on the fur. They have tried four, does not work; five, does not work. It's only possible with three cells. And that remembers that when we split at the beginning of our life (two cells and then one cell in two), we go at a three cell stage. It's probably at that time that a message goes from one cell to the two other cells, come back to the first one and suddenly realize we are not a population of cells. We are bound to be an individual. That is individualization, that makes the difference between a population of cells which is just a tissue culture and an individual which will build himself according to his own rule, is demonstrated at the three cell stage, that is very soon after fertilization has occurred.

If we stop the process, if we slow down the movement of the molecules, we progressively come to a relative standstill, and when the embryo is frozen, these tiny human beings, they are very small, one millimeter and a half of a dimension, a sphere a millimeter and a half, you can put them in canisters by the thousands. And then with the due connotation, the fact of putting inside a

19

very chilly space, tiny human beings who are deprived of any liberty, of any movement, even they are deprived of time, (time is frozen for them), make them surviving, so to speak, in a suspended time, in a concentration can. It's not as hospitable and prepared to life as would be the secret temple which is inside the female body that is a womb which is by far much better equipped physiologically, chemically, and I would say intellectually than our best laboratories for the development of a new human being.

That is the reason why thinking about those things, I was deeply moved when you phoned to me, knowing that Madame, the mother, wanted to rescue babies from this concentration can. And to give to the baby—I would not use term baby, it is not perfectly accurate, not good English—would offer to those early human beings, her own flesh, the hospitality that she is the best in the world to give them. And because Mr. Palmer told me on the phone that it had been said that if you, Madame, were not entitled to give this shelter to the baby-to the early human beings, (beings perfectly correct in what I mean)—you would prefer that they would be enjoying another shelter and not being left inside the concentration can, or destroyed. And I was impressed because it remembered me of an extraordinary trial which has occurred more than two thousand years ago, and I could not believe it could occur again, that two persons will discuss whether it's better to have an early human being alive and given to a certain person or another person would prefer the baby not being alive at all. And to the best of my recollection this judgment has been considered as a paragon of justice when Solomon did it. I was not thinking I would come from Paris to speak in Tennessee about a two thousand years old trial. But I realized when you phoned to me, it was the first time it was arising in this earth with a very early human being, because before early human beings were not in our reach, they were protected inside the secret temple. And then I felt it was opportunity that a geneticist was going to tell you what our own science tells us.

If this trial had taken place two years before, I would have stopped because I would have told you all that we knew at that moment. But with your permission, your Honor, I will continue a little further, faster and faster.

THE COURT: Yes.

THE WITNESS: We know much more, since the last two years, we know that the uniqueness of the early human being I was talking at the beginning, which was a statistical certainty (but an inference of all we knew about the frequency of the genes, about the difference between individuals) is now an experimentally demonstrated fact. That has been discovered less than two years ago by Jeffreys in England, the remarkable manipulator of DNA. And Jeffreys invented that he could select a little piece of DNA, of which he could manufacture a lot of it, which is specific of some message in our chromosomes. It is repeated a lot of times in many different chromosomes and which is probably a regulation system. Some indication to do something or do another thing, but

20

13

not a kitchen recipe, but a precision about what to do.

And because its only telling the cells that this should work and this should not work, it can assume a lot of tiny change, so that there are so many of those little genes and there are so many little changes in them that we receive from father and from mother an array of those genes that we can realize very simply, you get the DNA, you put it in solution and you have it spread in a special medium. Then you put this special probe made by Jefferys, and what you see it looks exactly like the bar code that you have probably seen in the supermarket, that is, small lines of different breadth and different distance from each other. If you put that bar code and you read it with an electronic device, it tells the computer what the price of the object and tells a lot of other things.

Well, its exactly what it tells us that when we look at the DNA bar code, and we detect every individual is different from the next one by its own bar code. And that is not any longer a demonstration by statistical reasoning. So many investigations have been made that we know now that looking at the bar code with his Jeffreys system, the probability that you will find it identical in another person is less than one in a billion. So it's not any longer a theory that each of us in unique. It's now a demonstration as simple as a bar code in the supermarket. It does not tell you the price of human life, it has a difference with supermarket.

The second advance has been that we know now that in one cell we can detect its originality. That has been due to the discovery of a new system which is called PCR, which is becoming extraordinary popular. It started two years ago, You can take a tiny piece of DNA, one molecule taken from one cell, you see how little this is, you can with that technique reproduce it by billions, and when you have enough you can make the analysis of Jeffreys and see again that we have the whole demonstration of uniqueness, not only in a sample taken from the individual, but in one cell, in one nucleus of one individual.

Another is a third discovery which is by far the most important of all, which is that DNA is not as dull as the magnetic tape I was talking before. Nature is imitated by our discoveries, but she has known much more than we have yet discovered. In that sense, that the message written on DNA is written by change of the various bases which come one after the other in that one meter long molecule. But now it happens that twenty years ago it was described with certainty that some of the bases of DNA were carrying an extra little piece we call a methyl, (which is $CH_3$) which is just hooked on it and change a little of the form of one of the bars of this long scale which is the DNA molecule. Nobody understood what it was meaning. And it's only four years ago (especially by the discovery of Surani) that we have begun to understand that we were up to something extraordinary, which is that those tiny little bits of methyl which are put on the base, cytosine, which is transformed in methyl-cytosine—I'm sorry to be technical, your Honor, but I cannot translate it, it's chemical slang.

21

14

THE COURT: I understand.

THE WITNESS: Is exactly comparable to what does an intelligent reader when he wants with a pen to underline, to highlight some passage or to scratch, delete another sentence. That is with the methylation, one gene which is still there is knocked out, put to silence, but if it is demethylated on the next division, on the next cell, then it will speak again.

Now, the basic discovery was that this is possible because this tiny change on the DNA, changes the surface of the big groove of the helix of DNA. It is inside this big groove that some molecules, some proteins will hook on different segments specific of the DNA. It is a kind of language telling to the chromosome: You have to tell this information or for this information, shut up, do not speak this one for the moment. It's very necessary, because there is so many information in our cells that if they were expressing everything, every time, to have the energy spent by one cell would be much more than the energy of our whole body. So it's necessary that we have some silent gene and some gene giving expression, expressed.

Now, the basic discovery is the following, and it is directly related to our discussion: That the DNA carried by the sperm is not underlined (or crossed) by this methylation on the same places which are not equivalent in the DNA chromosomes carried by ovum. During the manufacture of the sperm there are indications, it's penciled, so to speak. It's underlined, you should do that. But on the equivalent gene, on the equivalent chromosome manufactured by the mother, the underline is in a different place, and it underlines something different. So that at the moment the two sets of chromosomes carried by the sperms and the egg are put together, they are not as we believed for years identical. We knew there was a difference with the "X" and "Y" chromosomes, but for the others they were believed to carry the same information; that is not true. Some information is to be read on as coming from the male chromosome, and another information from a chromosome coming from the mother. Now, the reason is that the fertilized egg is the most specialized cell under the sun because it has a special indication underlining segments of DNA which shall be expressed and others that shall not be expressed that no other cell will ever have in the life of this individual. When it's split in two we know that exchange of information comes from one cell to the other one. When it's split in three it receives information we are an individual. And when it continues progressively, the underlining system is progressively changed so that cells do differentiate, and cells become specialized doing a nail, doing hair, doing skin, doing neurons, doing everything.

And the very thing is that during this process, the expansion of the primary formula which is written in the early human being, nothing is learned but progressively a lot of things are forgotten. The first cell knew more than the three cell stage, and the three cell stage knew more than the morula, than the gastrula, than the primitive streak, and the primitive nervous system. In the

22

15

beginning it was written really not only what is the genetic message we can read in every cell, but it was written the way it should be read from one sequence to another one. Exactly like in the program of a computer, you don't put only the equivalent of the Algebraic formula, but you tell to the computer do that; if you get that result, then go at that and continue that program; or if you don't get the result, continue and go to the other program. That is written in the first cell; is progressively forgotten in the other cells of our body.

At the end of the process when the organism has grown up, it produce then its own reproductive cells, it puts the counter to zero again, and hence the rejuvenation. A new life will begin when a female and a male cell will encounter to produce the next generation. So I would say very precisely, your Honor, that two years ago I would not have been able to give you this very simple but extremely valuable information which we have now, beyond any doubt.

I would give you an example of why it's not theoretical. We can manipulate with mice—not me, but my colleagues. And with mice they have been able to make pseudo zygote, that is, to take one egg, expel its own legitimate nucleus and put, for example, two nuclei coming from sperm, so they have diploid cell, a diploid zygote containing only two sets of paternal origin; it fails to grow. They have tried to do it with two maternal original nuclei, that is, two maternal chromosomal cells and no paternal cells. It's diploid; by the old theory it should grow, but it does not. But curiously both of them do something; they don't build a full imago, that is, the whole form. But they specialize. If there is only male nuclei, two male nuclei making what is called an androgenote, it produce little cysts which are looking like the membranes and placenta that the child is normally building around himself to make its space and time capsule so that it could take the fluid from the mother vessels. An early zygote containing only male chromosome does only that.

If a zygote contains only chromosomes from female origin, it makes the spare parts. It makes pieces of skin, it makes piece of teeth, it can make a little nail, but all that in a full disorder, not at all constructed it makes the spare parts. We know this directly by experiment in mice done by Surani last year. But we knew that but we could not understood it before.

We knew that already in man, because in man we know that there are what is called dermoid cysts which is a division of a non-fertilized egg inside the ovary of a virgin girl. It cannot grow. It's rare, but it is well known. It will never give a little baby, but it makes the spare parts, teeth, nails, all that mixed in incomprehensible disorder. On the reverse we knew that sometime after apparently normal fertilization the product does not divide correctly but makes cysts, little balls again and again and again, and it's called a mole, hydatidiformis mole, and it's very dangerous because it can give the cancer to the pregnant woman.

Now, we have discovered—(not me), you have to know I'm professor and when I say we, it's all the professors of the world, it's not me. We have discovered that in those hydatidiformis moles, there were only paternal chro-

23

16

mosomes. There were two sets of paternal chromosomes and the maternal pronuclei had died, we don't know why. So we know by the mice experiments that it is related to methylation of the DNA.

Hence, we know by the human observation, that there is a specialization of information carried by the sperm compared to the information carried by the ovum. And I would say I was wondering, not surprised, but wondering that we were discovering at this extraordinarily tiny level of information built into the chromosomes, that paternal duty was to build the shelter and to make the gathering of the food, to build the hut and the hunting. And that the maternal trick was household and building of the spare parts so the individual can build himself. And it's a kind of admiration that we have for nature that since we have seen in the grown up that the man is going hunting and the mother is doing the kitchen, it is just the same deeply written inside our own chromosomes at the very beginning at the moments the first human constitution is spelled out.

Well, I have abused your kindness, your Honor. I have spoken maybe too much, but I would say to finish that there is no, no difficulty to understand that at the very beginning of life, the genetic information and the molecular structure of the egg, the spirit and the matter, the soul and the body must be that tightly intricated because it's a beginning of the new marvel that we call a human.

It's very remarkable for the geneticist that we use the same word to define an idea coming into our mind and a new human coming into life. We use only one word: Conception. We conceive an idea, we conceive a baby. And genetics tell us you are not wrong using the same word; because what is conception? It's really giving information written in the matter so that this matter is now not any longer matter but is a new man.

When we come back to the early human beings in the concentration can, I think we have now the proof that there are not spare parts in which we could take at random, they are not experimental material that we could throw away after using it, they are not commodities we could freeze and defreeze at our own will, they are not property that we could exchange against anything. And if I understand well the present case and if I can say a word as geneticist, I would say: An early human being inside this suspended time which is the can cannot be the property of anybody because it's the only one in the world to have the property of building himself, And I would say that science has a very simple conception of man; as soon as he has been conceived, a man is a man.

THE COURT: Before we go further, let's take a break, a very brief break, actually a little longer one than we usually do. As most of the representatives of the media know, there is some hospitality being furnished you by the Blount County Chamber of Commerce. I want you to have an opportunity to enjoy that if you care to, so we will stand in recess about twenty-five or thirty minutes at which time our testimony will resume,

24

17

Parties may excuse themselves and Dr. Lejeune you may come down.

(Parties and counsel leave the courtroom.)

THE COURT: Ladies and gentlemen, we'll stand in recess.

(Brief recess.)

THE COURT: Dr. Lejeune, if you would come around and take the witness stand. Mr. Christenberry.

MR, CHRISTENBERRY: Thank you, your Honor. BY MR. CHRISTENBERRY:

Q. Dr. Lejeune, suppose that—as a hypothetical question, but suppose that we had heard testimony in this hearing that indicated that each mom and each dad contribute identically the same to the embryo, and that there is no differentiation between their contributions, could you tell us what your opinion is about whether or not cells are differentiated?

A. It's difficult to answer that because once you know something in science, it's very difficult to tell what you would think if you were not knowing it. If the paternal and maternal chromosomal share of the baby was the same, we wouldn't have any idea how this differentiation of cells do occur, so if I had testified two years ago, I would have said that the mystery of cell differentiation was complete, and we did not know where it was written. Now we begin to know where it's written. It's the only difference, but it's a great difference that we begin to know. It tells us definitely that what was an implication that it must be written in the first cell, (this type of differentiation must occur at this time and at the other time another differentiation should occur). We knew it should have been written, but we did not know at all how it was.

Q. Okay. And so you testified at great length about the differentiation.

A. Yeah.

Q. And you did that for what purpose?

A. For the purpose of' understanding how from an apparently undifferentiated cell which is the one cell of the fertilized zygote, the full imago can emerge. If science cannot say anything about the mechanism of it, it just remains a pure constitution but no knowledge about it. It's the reason why I wanted to put on record those new findings about the methylation of DNA, because it proved that the implication which was as all of genetics, that differentiation is, so to speak, prewritten in the first cell, is now having an understandable physical support. Now, it cannot be said that the first cell is a non-differentiated cell. It must be said now the first cell is knowing how to differentiate the progeny, the cell progeny.

Q. Okay. And for me to understand

A. To make it clearer, if I am looking at the mass of cell growing, I know by my own experience in my lab for twenty years that never a baby will form itself in our bottles because we are growing cells taken from the body. On the contrary we know that if the cell which is dividing is a fertilized zygote, a new individual is Just now beginning to emerge.

25

Q. What ethical considerations do you have about freezing?

A. I think love is the contrary of chilly. Love is warmth, and life needs good temperature. So I would consider that the best we can do for early human beings is to have them in their normal shelter, not in the fridge. The fridge is not a second choice, I would say it's a third choice. And typically I would not be surprised that in a few years from now, this long way outside the female body which is artificial insemination and this long stay in concentration can will be considered as not very efficient. It will be much better to make graft of the tubes to repair the difficulty of the tubal incapacity, or to use antibiotics—new antibiotics to prevent special difficulty with the mucosa of the tubes, or find chemicals which will help find why certain couples, although they have normal production of cells, cannot manage to get fertilization, or to get implantation. It's surely some chemical thing which is not yet discovered which will be the real solution. Then I would consider that the extracorporeal fertilization, it's, so to speak, an emergency proposal of medicine on the present stage of medicine, but it's not good treatment. The good treatment is yet to be found in each of the cases. It's not the final answer, so to speak, not at all. That is my feeling, but it's a feeling.

Q. One moment, please. Doctor, I would ask you this question, and I'm going to read it to you so I'll understand how to ask it. It has been stated that once you get to blastomeres and they are unequal in size, that nobody knows for sure why division of these cells might be equal in some conditions and unequal in other conditions. Do we now know why the unequal and equal nature exists?

A. That is a very difficult question. We know that normally, as I said, the stage of three cells is due to inequal division of the first blastomeres, and that seems to be the basic normal phenomenon. But why nature do that it's still to be discovered, but it seem to be, the starting phenomenon. Then I would say that obviously there must be something written in the egg, telling the egg you split in two, then one of the cells split in two, then you can discuss together all three to know what to do, the three cells together. It's not a surprise, it's an obvious phenomenon known for a long time it was not explained at all, which has now found explanation. We know that in any typical chimera, made from different embryos, only three line of cells can manage to build an imago together. That means that the individualization is at the three cell stage.

Q. Within your knowledge, Doctor, can you tell us what we know and what we can tell about these human beings from three cells forward? What knowledge do we gain and at what rate do we gain it? Do you understand my question?

A. No.

Q. Okay. We have heard testimony that at three weeks you have got this, the nervous system starts at this stage

A. Yeah.

Q. This starts when and it's been confusing, because we have tried to

26

19

eliminate—we tried to identify body parts, we're thinking in terms, and you come to us with a different perspective. Can you tell us once again what it is we have and how it progresses in development?

A. Well, from the very beginning we have a embryo. We have first a zygote and a two cell embryo and then a three cell embryo and then a four cell embryo, and then eight, and sixteen, and all the power of two. This embryo, growing progressively, is inside the zona pellucida and suddenly at around six days or seven days it begins to "hatch." The zona pellucida is, in fact, the protection, or privacy, so that if they are twins, for example, they will not mix together because each of them is in its own zona pellucida.

At the moment the embryo begins to hatch and make trophoblast which will anchor itself on the mucosa, there is already so much commitments we cannot see. There is already so much committed to build the individual that it will not mix with a possible twin. Otherwise, in species in which you have a lot of pups in a litter of five, ten, like in kittens or in dog, if they were not protected, each of them at the beginning in their own plastic bag (in their own zona pellucida), they would not make different animals, they would mix and make a kind of chimera. But when it's so well committed, when all the cells are so well committed to continue to cooperate with each other, then nature has invented that embryo will hatch and rupture the zona pellucida and begin to anchor on the uterus.

The second step, we can describe around twelve days after fertilization; that is the very beginning of the little line which cells begin to draw on the embryo; this little line will progressively become a kind of *gouttiere*—I don't know the word in English—and finally will close itself in a tube, and it will be the beginning of the neural tube.

Then well, let's say, what I should say more? I will describe the whole development of the imago, let's say at three weeks, the cardiac tubes will begin to beat, so that the heart is beginning to beat three weeks after fertilization. And progressively you will reach the end of the embryonic period at two months after fertilization. At that moment the little fellow will be just size of my thumb. And it's because of that that all the mothers telling fairy tales to the children are speaking about Tom Thumb story because it's a true story. Therefore, each of us has been a Tom Thumb in the womb of the mother and women have always known that there was a kind of underground country, a kind of vaulted shelter, with a kind of red light and curious noise in which very tiny humans were having a very curious and marvelous life. That is the story of Tom Thumb.

Well, after Tom Thumb is visible, that is, two months of age, it has two centimeters and a half from the crown to the rump, and if I had it—if I had him on my fist, you would not see that I have something, but if I was opening my hand you would see the tiny man with hands, with fingers, with toes. Everything is there, the brain is there and will continue to grow.

27

**20**

It's from that moment which is two months after fertilization, that we don't call any longer human being embryos, we call them fetuses. And that is very true to change the name just because it tell a very plain evidence: Nobody in the world looking for the first time at a Tom Thumb bag, looking at an embryo of two months of a chimpanzee, of a gorilla, of an orangutan, or of a man, nobody in the world would make a mistake just looking at him. It's obvious this one is a chimpanzee, this one is an orangutan, this one is gorilla, this one is a man.

The reason why we change the name, and we call it fetus, it means only something to be carried because the full form is already present. But the man was there before everybody could tell the difference with a chimp. For example, if we were taking one cell—I would not do that because it's dangerous for the being, but if we were taking one cell of a four cell embryo, it would probably survive and compensate. We know it in mouse. Now, let's take one cell of a chimpanzee embryo, of a human embryo, of a gorilla embryo and give it to one of my students in the Certificate of Cytogenetics in Paris, and if he cannot tell you this one is a human being, this one is a chimpanzee being, this one is a gorilla being, he would fall his exam; it's as simple as that.

Q. When you see the development of three cells

A. Yeah.

Q. And if we used the most intricate computers, let's say, that would be used in our space program, NASA we call it, could those computers be programmed to keep up with what is going on?

A. No, totally not. The amount of information which is inside the zygote, which would if spelled out and put in a computer tell the computer how to calculate what will happen next, this amount of information is that big that nobody can measure it.

I have to explain that very simply. You have the two meters of DNA, one coming from father, one coming from mother, that it means ten to the eleven bits of information, just to spell out what is written on this DNA. If you add the subscript that I was talking about methylation, then it will increase this number by ten to the power four or to the power five. Thus, we will go very soon, just for the DNA, at ten to the fifteen. It's an enormous number. To give you an idea, just to print letter by letter all what it is written in the DNA of a fertilized egg, you would need, writing G, C, T, A, and all the string of symbols, you would need five times the Encyclopedia Brittanica just to spell out the DNA, five times Encyclopedia Brittanica. But nobody could read it. You could fit it into the computer. But now you would have to take care of all the molecules that are inside the cytoplasm which will recognize the message, which will send a message to the next cell. And to spell out this amount of information which is absolutely necessary, (otherwise no life would be possible), I think you would need a thousand, a million times more bits of information. No computer in the world would have a storage enough just to fill the amount of data. Now, to tell

28

21

to the computer the algorithm to use it, nobody knows how to do it. You have to realize that this enormous information which makes a man is enormous compared to the information which makes a computer, because it's a man who has made the computer', it's not the computer which has made the man.

MR. CHRISTENBERRY: You may ask him. I would like to interject at first if the Court—while it's fresh on the Court's mind, would have any questions of the Doctor. He's used to facing a judge after he's told his side of the story, and sometimes we do that in our system.

THE COURT: I have no questions at this point.

MR. CLIFFORD: Thank you, your Honor.

CROSS EXAMINATION

BY MR. CLIFFORD:

Q. *Bonjour*, Dr. Lejeune.

A. *Merci.*

Q. Now that we have exhausted my French, we'll hopefully proceed in English. Let me first thank you very much for being willing to come here to Maryville, Tennessee, to appear in this trial. I believe, in fact, you come at your own expense, is that correct?

A. Uh-huh (affirmative).

Q. Now, please bear with me, Doctor, if you're not familiar with what I may be doing, in France they have civil law and we, as you may know, take our law from the British system, the common law. Please interrupt me if you're not sure where I'm going. Let me ask you this: Have you testified before in an American Court?

A. Yes.

Q. Could you tell me what testimony, what cases you have testified in?

A. Well, in American Court I have testified especially on those questions. It was—I don't remember the Court it was.

Q. Do you remember maybe testifying in 1981 in the state of Maryland?

A. Yeah,

Q. You recall that?

A. Yeah, yeah.

Q. What was that trial about?

A. Well, if I'm well remembering, the trial was about a baby who was inside the womb, a very different case. And if I remember exactly the story because I am not a lawyer, you know, I was not invited giving my opinion about the case, but giving opinion about another question which was whether this baby who could have been, I suppose at that time, some—must have been three months old, was really a human being. It was a very simple question, but it had to be as well answered with the available knowledge at that time.

Q. I believe, Dr. Lejeune, in that case the question was whether or not a woman should be allowed to have an abortion?

A. I think the question was whether the husband should say he did not want

29

22

the baby to be expelled. That was the question.

Q. And I believe, and correct me, of course, if I'm wrong that in the proof of that case the child had a chromosomatic, chromosome defect which would likely lead

A. No, I don't know that. I've not been aware of that, I have not heard about that. It was not said at the trial, no.

Q. In that case you testified, I believe, that in your opinion the fetus in that case was a human being?

A. It was not my opinion. It was the teaching of all the genetics that I was giving, It's no doubt it's a human being because it cannot be a chimpanzee being, so it's a human being.

Q. And you opposed abortion in that case?

A. I dislike to kill my—a member of my kin, no doubt. And beside that I'm a French Doctor, I have sweared the oath of Hippocrates. Hippocrates four hundred years before Christian era made an oath that, "thou shall not give poison, thou shall not procure abortion." It's very interesting for us doctors because at that time in which slavery was the law, at the time in which the father of the family was allowed to kill a baby at birth, or even later, he founded medicine by preventing new doctors to give poison or to give abortion. That was meaning that does not matter what the size of the patient; a patient is a patient. That is Hippocratic oath.

Q. I believe that perhaps the first commandment is first do no harm?

A. Thou shall not kill, yes, I have heard something about that.

Q. Let me understand what your expertise is. You are obviously an expert in genetics.

A. Yes.

Q. Do you recognize the scientific field of embryology? Do you recognize there is a scientific field called embryology?

A. Oh, yes, no doubt.

Q. Do you claim to be an expert in the field of embryology?

A. I claim to be not entirely ignorant.

Q. But do you offer yourself as an expert in the field of embryology?

A. No, I'm not an expert in the field of embryology by itself.

Q. Let me ask you if you are offering yourself as an expert in the field of psychology?

A. In the case of genetics I would have said yes because I have been so much involved in so many cases that I have learned about human psychology more than I should have in the faculties.

Q. But you, I take it, do not claim to have a degree in the field?

A. No, I have not a degree.

Q. Do you claim to have expertise in computer science?

A. Partly, sir,

Q. Do you claim to have academic credentials in the field of computer

30

science?

A. No, not academy credentials. I have written things which were agreeable to some academicians.

Q. Finally, do you claim any expertise in law?

A. Oh, not. I have some heredity about it, my father was.

Q. You may be more of an expert than you wish you were. But you do not claim any academic training in the law?

A. Oh, no.

Q. Or experience with the law.

A. Experience, yes, a little experience.

Q. Dr. Lejeune, I take it it has been known for quite a considerable length of time that the genetic material that started out in the ovum and the sperm combined, of course, into the zygote?

A. Oh, yes.

Q. How long has that been recognized?

A. It's difficult to tell because fertilization has been discovered by Spallanzani, but he did not know about DNA, he did not know about chromosomes, then it was just the mixing of two cells. It was at the end of the 17th century. You asked me to tell you the whole story of genetics

Q. No, no.

A. I agree, but it will take a month.

Q. Doctor, I'm asking you approximately how long it has been known by the science of genetics that it was the coming together of genetic material, regardless of whether the precise material was known by its nature or not?

A. I would say more than fifty years, going back to the early nineties.

Q. Early nineteen nineties?

A. Nineteen.

Q. 1920's?

A. Earlier than that, Eighteen, nineteen—I cannot explain.

Q. I think we would agree it's been a long time.

A. A long time. Three generations of students.

Q. And I take it at some point it became understood in the field of genetics, that the genetic code or blueprint for the mature entity was contained obviously in that first cell?

A. As I said it was known by inference, the inference was made, but the demonstration was not there.

Q. Of course, often we refer in science to the concept of a theory.

A. Uh-huh (affirmative.)

Q. A theory being, of course, and you correct me if I'm wrong, a proposed explanation of how a system, in this particular case genetics, works, and then we do experiments to see if our theory holds water or whether it needs to go back into the shop?

A. Yeah. I would say model.

Q. Model, yes. Now, in genetics, I would take it, it has been believed on the theoretical level, all of the genetic material, all of the information as you referred to it was in the zygote, that has been believed theoretically for a very long time?

A. No doubt.

Q. And that what you have described to us at such length today has been the working out of the precise mechanism of how that works?

A. In a sense, yes, but it's a little change that previously it was an inference and now we begin to have a demonstration. For a scientist it makes a lot of difference.

Q. Of course. But if I had come to you, Dr. Lejeune, ten years ago, and I had said, please help me with my genetics, Doctor, do you believe that all of the information that's necessary for the development and maturation of a chicken—

A. Yeah.

Q. Is contained in that zygotic cell we first see in the egg—

A. Yeah.

Q. Would you have told me that you believed that?

A. Well, to be perfectly correct, I would say I believe it; now I would say I know it. That's a small difference.

Q. But I take it it would be true that, again, ten years ago had I asked you this question about the chicken that your level of conviction about all that information being in the zygotic cell would have been very high?

A. Yes, pretty.

Q. And certainly if in genetics we had discovered that some information was coming into cells from some other source than the genetic material and having an impact, we would have all been stunned, scientific world would have been stunned?

A. Yeah, yeah.

Q. Now then, you described at great length this morning, the precise nature of the development of embryos as far as the mechanics of the genes and chromosomes and information that is passed from each gamete into that zygote, and you, of course, described it as an incredibly complicated procedure?

A. Uh-huh (affirmative).

Q. I take it that your questions, you were answering specifically about human embryos, zygotes, sperm, ova, but I take it that is also true of chimpanzees, gorillas, mice, they are-in those species it's also a very complicated fascinating complex mechanism?

A. Yes, but not exactly the same mechanism.

Q. Certainly. I think I have read somewhere, and I'm sure if I'm not right you'll correct me, that genetically as far as the chromosomes, as far as the contents of the DNA in the chromosomes, for instance, man, Homo sapiens, and the higher mammals, particularly the gorillas, chimpanzees—help me look for that species.

32

A. Orangutan.

Q. There is a remarkable similarity?

A. Well, it depends what you remark. You can remark the similarity, or you can remark the differences. And difference is incredibly interesting. I don't know where you want to ask me.

Q. Well, I have heard it said or read that approximately ninety-eight percent of the genetic material that is found in a chimpanzee or gorilla is identical to what may be found in a human being.

A. It has been written, and it has been written by statistical calculation of the DNA but not about the meaning of it. Now, what makes ninety percent similarity in the number of words in two different texts? They can mean something very different by the way the sentence are made. It's what makes the difference between the species.

Q. But there is a similarity in the DNA?

A. Oh, yes, exactly like the similarity in the fact they have two hands like us, not the same thumb, but they have hands, we have feet, but they are the most similar to us, no doubt. It's no surprise that the DNA also has some similarity.

Q. But the same basic process that we observe in human beings we also observe in chimpanzees?

A. Oh, yes.

Q. Mice?

A. Mice, I would not go that far but partly.

Q. Mice have zygotes?

A. Oh, yes, I mean—I want to make clear when we speak about basic mechanism we have to know what we mean by basic. For example, I told you the enormous importance of methylation of the DNA we discovered those years. But, for example, Drosophila does not methylate the DNA.

Q. That's the fruit fly?

A. That's the fruit fly but it's a very complex organism. It's makes a differentiation of cells that makes me believe that with methylation we have unveiled one of the tricks used by nature, but there are other tricks we are still using, we men, that were sufficient to build a Drosophila but would not be sufficient to build the human being. I would not agree that basic mechanism are the same in the whole living system. Surely it's much more complicated to build a human being, to determinate on one cell the wiring of his brain so that he will some day invent machine to help his own brain to understand the law of the universe. There is something peculiar to the human beings compared to others, you know. I will tell you one thing, very simple: I'm traveling a lot, and as far as I can I visit two points which are very important for me when I go in a new town: One is the university and other is the zoological garden. In the university I have often seen very grave professors asking themselves whether after all their children when they were very young were not animals, but I have never seen in

33

26

a zoological garden a congress of chimpanzees asking themselves whether their children when they are grown up will become universitarians. I feel there is a difference somewhere.

Q. Doctor, I forgot to ask you a couple of questions about your expertise, and please pardon me for having to come back, but I take it from your testimony when Mr. Christenberry was asking you questions that you have not worked in the field of what is called in this country in vitro fertilization?

A. No.

Q. I believe in France there is a different term for that.

A. No, it's called also *fecundation in vitro*.

Q. But you have not been involved any in in vitro fertilization clinics?

A. No.

Q. You have not been asked to advise in vitro fertilization clinics on matters of genetics or anything else?

A. Not directly, but I have advised a lot of my patients who consider whether they should have or not this type of investigation.

Q. I suppose I should ask you this. I understand in vitro fertilization is done in France?

A. Oh, yes.

Q. How long has this procedure been carried out in your country?

A. Well, I think Amanda has been six years, now, six years and a half, she was the first test tube baby in Paris. I think she is six years, seven years maybe.

Q. Let me see, Dr. Lejeune, if I understand the point you are making this morning. It is your belief as a geneticist, that all the information that is necessary to create a human being, a unique individual human being, we could go in and find in a nucleus of a zygote?

A. No, I never said that. In the zygote I would say, not in the nucleus. You need the nucleus and whole cytoplasm. The zygote cannot be reduced to the magnetic tape. We have also to have the tape recorder working,

Q. We can take if we wished on a perhaps philosophical scientific experiment here, we could take a zygote, look at it, look at the DNA, look at the other structures in that one cell and assuming that we had the knowledge to be able to do it, tell everything about that human being?

A. I would say yes, beside accident. which cannot be predicted, but I would say no machine is big enough to put in it this information, it Is purely \hypothetical.

Q. Right.

A. It's not practical.

Q. We're engaging on a philosophical experiment.

A. To be frank and to give you my belief I'm not sure well be any time able to build a machine big enough to do that job. There is no evidence about that.

Q. Dr. Lejeune, then theoretically

A. Otherwise this machine would be a fertilized egg itself.

Q. But if we had such a machine on our philosophical experiment, we could look into the zygote, and we could tell what color hair this person would have?

A. No doubt.

Q. What color eyes this person could have?

A. Yes.

Q. Could we look into the zygote and, either in the structure or chromosome or DNA, and tell what language the person would speak?

A. I don't believe so, sir, because language is a basic phenomenon built in. We could say, in your example, theoretical example, this being will be able to speak, but he will speak Japanese if he is in Tokyo. But we could say conversely with your same system, looking at a chimpanzee first cell, this being will never speak.

Q. Could we look into the zygote, into the genes of the chromosomes, into the DNA structure and tell whether this individual would like the music of Beethoven?

A. Partly, yes, sir, because we could in your hypothesis be sure that he is perfectly normal, and if he is perfectly normal he would like Beethoven.

Q. Dr. Lejeune, do you intend to investigate to find the defective chromosomes for those who do not like Beethoven?

A. No, no, but you were asking me about normality.

Q. Could we look into the zygote, into the chromosomes, DNA, into the balance of the structure, and tell whether this individual would grow up to be a person of liberal or conservative persuasion?

A. Well, even looking at the grown-up I cannot tell that, sir.

Q. Of course, as you realize, Professor Lejeune, I'm trying to make, I guess, a philosophical point, and that is while some information, a great deal obviously of information is contained in that zygote, that there would obviously be things we could not detect with our philosophical machine about the individual when he or she was twenty, forty or sixty?

A. Uh-huh (affirmative).

Q. Dr. Lejeune, let me come I guess to what is the heart of the matter here and the heart of your testimony. You mentioned using the word conception and defining it in two different ways, defining it as the point where a zygote comes into existence and the point where we have a thought, and really would you agree with me, Dr. Lejeune, that what we're concerned about in this case and in the great debate about human life are definitions? How do we define a human being?

A. Oh, yes.

Q. Now, of course, when you define a human being, what we're assuming there is that a human being has certain rights whether God given rights or legal rights?

A. That is not what define a human being.

Q. Of course not. I understand. But I take it and I will ask you directly, Dr,

35

Lejeune: You have referred to the zygote and the embryo as quote 'early human beings.'

A. Yeah.

Q. Do you regard an early human being as having the same moral rights as a later human being such as myself?

A. You have to excuse me, I'm very, very direct. As far as your nature is concerned, I cannot see any difference between the early human being you were and the late human being you are, because in both case, you were and you are a member of our species. What defines a human being is: He belongs to our species. So an early one or a late one has not changed from its species to another species. It belongs to our kin. That is a definition. And I would say very precisely that I have the same respect, no matter the amount of kilograms and no matter the amount of differentiation of tissues.

Q Dr. Lejeune, let me make sure I understand what you are telling us, that the zygote should be treated with the same respect as an adult human being?

A. I'm not telling you that because I'm not in a position of knowing that. I'm telling you, he is a human being, and then it Is a Justice who will tell whether this human being has the same rights as the others. If you make difference between human beings, that is, on your own to prove the reasons why you make that difference. But as a geneticist you ask me whether this human being is a human, and I would tell you that because he is a being and being human, he is a human being.

Q. And I take it you would believe from your testimony today that it is morally very wrong to intentionally kill a zygote?

A. I think it's no good, it's killing a member of our species.

Q. And it would be the same as if we were to kill twenty years later the person, human being, that the zygote would become?

A. It's difficult to tell because you ask me a justice question; I'm a biologist.

Q. Now, but those are your beliefs?

A. My belief is that it's no good to kill a member of our kin, very simple belief.

Q. There is not much difference to you between whether it's at the zygote level, the fetus level?

A. There is a great difference as they have not the same age. Some of them are very youthful ones, others are old ones. But it doesn't make for me a great difference, in the true sense of the fact it is discarding a member of my species. It's the only reason why I don't kill people, it's because they are human. Otherwise, some of them—some difficulty in life...

Q. Dr. Lejeune, you, of course, are a scientist, and I'm sure that in the large part, you base your convictions and feelings upon your knowledge of genetics and other sciences. Will you concede, Dr. Lejeune, there are other very distinguished scientists, men who are as learned as you, who have thought and who have access to the same scientific information that you have, who come to a

36

29

different conclusion?

A. About what?

Q. About the moral rights or moral duty to the zygote.

A. Oh, in that case yes, but not about the fact it's a human being or not.

Q. I understand that.

A. But that's the point.

Q. I understand that. There are even, I believe, individuals in your own country who differ with your view of what ethical duty is owed to the zygote.

A. Well, I think in France we are divided in forty million opinions about that.

Q. But you do recognize there are men in your own country of great learning who differ with your view on the ethics of the embryo and zygotic levels?

A. Oh, that's obvious.

Q. I believe, Dr. Lejeune, in the earlier—or I'd say slightly mid-nineteen eighties, your country set up a commission to study the ethical concerns raised by the technology of in vitro fertilization. Are you aware of the national commission?

A. Well, you can call it a national commission, it's specially appointed by the president of France, so all the people have been nominated by the president. It's a presidential thing. It's not really a national thing. It's called national, but it's not elected so it's not representative at all.

Q. Well, I believe it was called national commission.

A. They have called them national commission, but you have to know they are not representative. They are not elected by bodies.

Q. Were you on that committee?

A. No, and I can tell you why, because I'm a member of the *Academie des Sciences Morales et Politiques*, moral and political sciences, and normally a member of this academy should have been appointed ex officio. Deliberately in the constitution, the by-laws of this committee, our academy was not put on it because they knew that the *Academie des Sciences Morales et Politiques* would appoint me. Just an interesting phenomenon.

Q. So you feel –

A. I don't feel anything about it. It's just a fact. I don't feel anything.

Q. You believe you were intentionally kept off this committee?

A. I believe that our academy was kept off, no doubt.

Q. Since they knew that it would be you that was appointed you were intentionally kept off?

A. That is a scientific hypothesis, not demonstrated.

Q. But you do, I take it, recognize that the members of the national commission that were appointed were distinguished persons in their fields?

A. I have never seen somebody in a committee who is not distinguished, Sir.

Q. And regarding those individuals even if you disagree with them, I take it you would recognize their integrity?

A. Case by case.

Q. Case by case.

A. Case by case.

Q. Do you know all the members of the committee?

A. No.

Q. But you would, in general, agree they are persons of integrity and learning?

A. Case by case.

Q. Are you familiar with the report of the national commission?

A. Yes, I have read it.

Q. You have read it?

A. Yes.

Q. The report of your national commission expresses some very grave reservations about the technique we know here as cryopreservation. Are you familiar with that?

A. Uh-huh (affirmative).

Q. Let me ask you this, Dr. Lejeune: Do you share those reservations about cryopreservation?

A. I have many reservations. Probably it's not very good.

Q. We heard testimony from Dr. Shivers, who was the embryologist who worked in this case, that with cryopreservation there was a statistical loss of the frozen embryos in the range of, I believe he said, fifteen to thirty percent.

A. He's a better specialist about this attrition percent than I am.

Q. So that you can expect, therefore, by the rules of statistics if we freeze one hundred pre-embryos, and we come back to thaw them at any point, we know the odds are very, very high we'll only have seventy, seventy-five or eighty?

A. Uh-huh (affirmative).

Q. We knew that before we put them in the frigidaire?

A. Yes.

Q. Would you regard that as an intentional killing of embryos?

A. No, but I would consider that it's making the embryo running a risk, and whether this risk was in the best interest of the embryo or not is an open question. I explain. When we do an intervention in a baby for a heart disease, in some intervention we know that around twenty percent of them will be killed by the intervention. And in this case the intervention is made only if we know if we don't operate the child will be killed by the disease at ninety-nine percent of probability. Then we say in the real interests of this patient the best for him is to operate even if the operation is still dangerous, the danger is much greater if we don't operate. That is a way you can make indeed some choices in medicine which are dangerous but which are, in fact, the best that you can do in the interest of this particular patient.

Now, in the case of an embryo, I am not sure it is in his own interest that this choice is made.

38

31

Q. In fact it's made in a choice that as Dr. Shivers and Dr. King testified previously, that it merely gives the woman a better chance since she won't have to go through the stimulated cycle having shots and medication, hormones injected into her, it simply gives her a better chance of becoming pregnant. You're aware of that?

A. I am aware of that.

Q. So in cryopreservation we know that we are going to kill ten, twenty, thirty percent of these early human beings merely so the woman has a better chance of getting pregnant?

A. That would be one of the reservations that I would have, but I dislike you say you kill. It's not killing.

Q. If we were to take the members, the individuals seated in the jury box and I were to have a room I could put them in where we would know that thirty percent of them would come out dead, would you not agree I would be guilty of murder?

A. Well, it depends, sir, because if the room you were talking about were a shelter during a bombing time and if remaining in that room all of them will be dead, but in the shelter some of them will survive, even if thirty percent of them will be dead, you did well. So it depends on the reason why you did it.

Q. What if I did it not to take them out of a position of greater harm but merely for the benefit of some person other than themselves, not one of them but Mr. Palmer?

A. I suppose he would refuse you do it, I'm sure.

Q. You recognize the ethical and moral dilemma I'm raising, of course?

A. No, I don't recognize it, sir.

Q. You don't?

A. No, because you use the word killing. And if you take a embryo which has been frozen and you put him briskly at normal temperature so that he will die, you are killing the embryo. If you are freezing the embryo you are not trying to kill him, if I understand what you have in your mind is to help the embryo surviving so he could be implanted in the womb of the mother. So your technique is not good because you lose part of them, but you are not killing. And I would not say that my colleagues who are freezing embryos are killers. It's not true. Otherwise, maybe it's because I don't understand English, but I would not use the word kill.

Q. The national commission in its report used a term which in English is supernumerary?

A. Yeah.

Q. Referring to supernumerary embryos, referring particularly to cryopreservation, embryos which are not to be used with a particular patient, woman, who has undergone IVF. Are you familiar with that term, first of all?

A. I know that term, and it's a wrong term. Can you tell me a man who is supernumerary?

39

Q. Maybe just a lawyer.

A. I don't believe that, as a man he is not supernumerary. Maybe—I'm not saying anything.

Q. But that is the term that is used in the report of the national commission?

A. Yes, but it is a very misleading term, exactly the same thing as preembryo. You change the name because you will change your behavior, and I dislike that. I like to call a cat a cat, and a man a man. It's Wendell Holmes who said a man is a man is a man.

Q. And a dog a dog and chicken a chicken?

A. No, but "a man is a man is a man," is a saying in your country.

Q. Well, rather at this point debating whether the term was wise or not, I'm asking if that was the term that was used.

A. Right.

Q. Now, as I think I asked you and you told me awhile ago, the French commission did have reservations about the whole process of cryopreservation, because, of course, it leads to the precise problem that we have in this case. Of course, you know that regular IVF the woman is implanted or preembryos—excuse me, the embryos are inserted within forty-eight hours?

A. As soon as you can, yes.

Q. Whereas with a cryopreserved embryo, it might be six months, it might be a year. In fact, I believe that you are aware that the French guidelines provide for a year for the first child, recommend that a cryopreserved embryo should not be saved longer than twelve months for the first child?

A. Could I tell you because you speak about what is said in French that this committee is consultative. It means that what he says as guidelines is for himself.

Q. But these are the guidelines published by the national commission that was appointed by your government

A. It's consultative. It has no law, no force; just an opinion.

Q. But you are aware that the commission recommended one year for the first child?

A. Yes.

Q. And then with an extension of an additional twelve months if a second child was desired?

A. I don't follow you.

Q. One question that was raised in the commission was how long you should keep a cryopreserved embryo?

A. Yes.

Q. Now, and the committee recommended that it should not exceed twelve months without very special circumstances and without a great deal of thought by people concerned with the ethical dilemma of IVF, do you recall that?

A. I know about that, but I don't see the meaning.

Q. I'm just asking you about the report at this point.

40

33

A. Yes. Nobody knows from where it was coming, the time of one year. Out of the air?

Q. Now, the French commission recognized that one of the dilemmas that was posed by cryopreservation again was the open ended time, time during which, as in this case, things could change, is that correct?

A. I have to be very precise, I don't know by heart the whole document you are talking about.

Q. I'm not going to ask you to quote it. But let me ask you this: Are you aware that the national commission of France that spoke on this subject recommended that in the case where the project of the couple, that is, the IVF project of this couple is abandoned in the meantime, and that meantime refers to cryopreservation being used or is unfeasible because, for example, of the separation of the couple, the only solution retained by the committee by way of the least evil consist in the destruction of the embryos with the reservation of the possibility of donation for research"

A. I'm not aware of that at all, sit, because the consultative committee said it would not give any indication because they have not reached any opinion. I don't know what document you are talking about, but the one I have read was not this one. If you talk about this document, the opinions saying that it's better to kill the frozen embryos, it's just in my opinion wrong, I disagree with it.

MR. CLIFFORD: Your Honor, may I approach the witness?

THE COURT: You may.

BY MR. CLIFFORD:

Q. Let me show you a page here which unfortunately for me is in French.

A. That's good for me.

Q. And ask if you could read the title of the document?

A. (Reading in French.)

Q. Could you

A. I'll try to make a translation. Advice concerning research on human embryos in vitro and their utilization for medical and scientific purposes.

Q. Could you continue to read the page? If you would rather not—

A. Well, what interest?

Q. Just the headings.

A. Recommendation to the use of in vitro fertilization as answer to infertility— it's very long.

Q. Well, that is, in fact, the report of the national commission, is it not?

A. Well, I'm sorry, sir, but it's not printed. It's something made on a computer. I don't see any important document there because it's—probably it has been a project of it, but it has not been published as a final advice because as I know, what I have heard on television, they said they have not reached an opinion on that. I'm sorry, but it doesn't matter anyway. It's a consultative party.

Q. I'm somewhat surprised by that answer, Dr. Lejeune, because I'm given to understand—you can correct me here—in December of 1986, a committee of

distinguished French scientists made their report to the government. The report was started 1983.

A. No, no, there is no final advice given by this body on this particular problem. They have discussed it, and they said we will continue to discuss it. as far as I know.

Q. As far as you know?

A. Uh-huh (affirmative).

Q. You are not familiar with the national commission report?

A. When it is published, yes, I read it, but that is not published matter. I don't see where you want to go with this question.

Q. In fact, Dr. Lejeune, will you agree with me, sir, that there are distinguished, learned men and women in your own country of France who take the view that when a couple separates or is divorced that any embryos that may be in cryopreservation should be discarded or destroyed?

A. That there exists people thinking that, no doubt, because if they say that it's probably because they think it. But it does not prove they're right.

Q. Of course, not. Of course, not. And, of course, I take it because you have your feelings, you would concede that it does not prove that you are right?

A. On that, I would not agree entirely with you.

Q. Okay. All right. Would you agree with me, Dr. Lejeune, that really, of course, we're talking about what will become in this Court a legal question!

A. Yeah, partly.

Q. And that legal question is what quote 'rights,' if any, an embryo should have legally?

A. Disagree with that. I'm not thinking about the rights of the embryos—I'm thinking about the duty of the parents and of society. Duty is a different thing.

Q. Lets talk about duty because that is a word that courts can understand. You believe, in fact, there is a duty, and a strong duty, to bring, or attempt to bring an embryo to term and birth?

A. The embryos have been frozen for that purpose.

Q. I'm not so much talking about the particular seven embryos in this case, but any embryo that's been produced by IVF or in vitro fertilization.

A. It if it has been produced in the view that it could be put somewhere in which it could be developed, that is the womb.

Q. So you would believe that the man has a duty to bring it to life, bring it to birth rather, is that correct?

A. What man?

Q. This man, the man who is the donor of the sperm.

A. Yeah.

Q. That he has a duty, a moral duty to bring it to term?

A. Yes.

Q. And you would believe that the woman has such a duty?

A. I would believe that if she was not feeling having that duty, she would not

42

35

have accepted the beginning of the process.

Q. Now, you, of course, are best known for your discovery of the chromosome connected with Down's Syndrome?

A. That is long ago.

Q. You have researched since that point other conditions or diseases, abnormal conditions which relate to the chromosomes that are passed on by heredity, is that correct?

A. Yeah.

Q. If I understand what you also told us this morning, it is possible to tell at the zygote level whether

A. Not at the zygote level.

Q. At the embryo level?

A. Yes, and late embryo.

Q. Late embryo level whether or not this early human being will suffer from Downs Syndrome?

A. Oh, yes, yes.

Q. And as

A. In fact, it's essentially for a fetus. It is after two months.

Q. But there is no reason that you know of, I take it that we could not at some point in the not very distant future even make that diagnosis in the embryo level?

A. In some future, might not.

Q. I take it from your testimony, Dr. Lejeune, you would believe that even if the embryo, that early human being, was going to suffer from Down's Syndrome or some other very serious condition or abnormality, that it would still be the duty of the mother and the father to brings it to term?

A. I would say the duty is not to kill, and that duty is universal. And I would say that if by technique I was looking at the chromosomes of' this baby, and I see the chromosomes abnormal, say for example, he has a trisomy twenty-one, I would say that this is the disease. But if I look at the other forty-six chromosomes that are normal I would see the mankind of the baby. And I don't condemn a member of my kin.

Q. You would believe that the donors of that embryo would have a moral imperative, a duty to bring that

A. Not to kill the embryo.

Q. That early being into a later stage of human being?

A. Not to kill him.

Q. Now, let me drop back down to a bit more normal level of questions, Dr. Lejeune. Bear with me. Let's take a embryo in general, just statements that we can make about all embryos that would be true. That there is obviously a genetic contribution both by the woman and by the man?

A. Yes, there is a contribution by the father and by the mother.

Q. By the father and by the mother?

43

A. Yeah.

Q. And without the contribution of either there would be no embryo?

A. Correct.

Q. So on that sense the contributions of the mother and contribution of the father

A, Are both necessary.

Q. Are equal?

A. No, they are not equal. They are different, but they are both necessary.

Q. Both—

A. Necessary, absolutely.

Q. And now let's talk about a particular embryo, early human being, and let's look at this early human being when it's became a later human being. Obviously, as far as the genetic makeup of this particular individual, it might be, in fact, more strongly influenced by the mother's contribution, at least in some areas, or might be more strongly influenced by the father's contribution.

A. Who knows.

Q. Who knows. And, of course, unless we were to examine it, we wouldn't know.

A. Uh-huh (affirmative).

Q. And certainly you are not in this Court saying that women contribute more genetic material?

A. In fact, I'm obliged to say, yes, they contribute more genetic material. For example, all the DNA on the mitochondria is coming from the mother, not from the father. Makes a little difference. It's a fact.

Q. It's a fact?

A. It's a fact.

Q. But it's also a fact without both contributions—

A. They are both necessary, no doubt.

Q. But you are not here today saying, Dr. Lejeune, that the reason, the sole reason that Mrs. Davis should win this case and prevail is because her DNA contribution may have been slightly more than Mr. Davis' DNA contribution?

A. I don't understand your question. I cannot see how you can solve a judicial problem with DNA contributions.

Q. You are saying that it's your opinion that these embryos should be allowed to develop in this young lady because you believe they're early human beings?

A. I do believe they are early human beings, and I have been told that their mother offered them shelter. Who could refuse that?

Q. But not because of DNA contribution?

A. Because they're her own flesh.

Q. Well, they're his own flesh, too, aren't they?

A. Yes.

Q. And obviously he will be their father forever, for the rest of his life if there are children?

44

A. (Witness nods head in the affirmative).

Q. You will not deny that would have an effect?

A. I would not deny anything.

Q. I take it, Dr. Lejeune, therefore, if you believed that a embryo was not a human being as that term is used in ethical or legal or moral or philosophical or religious way that your view of this case may well be different?

A. Totally. If I was convinced that those early human beings are, in fact, piece of properties, well, property can be discarded, there is no interest for me as a geneticist. But if they are human beings, what they are, then they cannot be considered as property. They need custody.

Q. What it really turns on is what philosophically, ethically, legally that embryo may be. In your mind, sir, you have come to the very firm conviction that the early embryo or that the embryo is a human being, early human being, as you described it?

A. Yes.

Q. And you do recognize in other men's minds, after long and deep thought, learned men, they come to the opposite conclusion you do?

A. No, I don't agree with that.

Q. You don't agree with that?

A. I have not yet seen any scientist coming to the opinion that it is a property. It is what is the case. It's whether they are property that can be discarded, or whether they're human being who must be given to custody. That is it. You ask my question, I answer precisely; I have never heard one of my colleagues—we differ on opinion of many things, but I have never heard one of them telling me or telling to any other that a frozen embryo was the property of somebody, that it could be sold, that it could be destroyed like a property, never. I never heard it.

Q. Just so I understand what you're telling us, I take it, Dr. Lejeune, from your testimony that you would be opposed to abortion?

A. Oh, I dislike to kill anybody. That is very true, sir.

Q. You would believe that abortion should not be legal?

A. That is another point which is different. I think abortion is killing people, and I think in a good jurisdiction would make those killing people become rare. You cannot prevent everything.

Q. I take it, again, your basis of that belief would be that the fetus or embryo is an early human being?

A. Exactly. If it was a tooth, I would not worry about it.

Q. Finally, Dr. Lejeune, I'd like to thank you very much first for coming here to Maryville, Tennessee, to share your scientific and philosophical views with the Court. I hope that you enjoy your stay and that your trip back is enjoyable. I have only one final question for you. Okay? What is this?

A. Well, from here I suppose it's an egg, but I'm not sure.

Q. Let me get a little closer.

45

A. It looks like an egg.

Q. It's an egg?

A. It looks like.

MR. CLIFFORD: Thank you, Doctor, I thought you were going to tell me it was an early chicken.

THE WITNESS: Oh

MR. CLIFFORD: I have no further questions.

THE WITNESS: Your Honor.

THE COURT: You may respond, if you wish.

THE WITNESS: Yes, I would respond to that because I have never pretended that I could see through a shell. I don't know if it's has been fertilized so I cannot know whether it's an early chicken.

BY MR. CLIFFORD:

Q. All right. Let's talk about the difference for a moment, If I had in this hand a live chicken, would you agree with me if I were to take it and squeeze its head that it would feel pain?

A. Oh, probably.

Q. That it will be frightened?

A. Yes.

Q. And it would suffer psychological, if you can use that term with a chicken, stress?

A. I'm not competent in psychology, you told me, and especially not about chickens.

Q. But if I take this egg and assuming it is fertilized—I wouldn't really do this, Jay—but if I were to crush it in my hand, this egg would not feel pain, it would not be aware in the slightest of what was happening to it?

A. Yeah. But it would be still a chicken and only a chicken.

Q. I thought you told me it was an egg?

A. You told me it was a chicken.

MR. CLIFFORD: No further questions.

(A brief discussion was held off the record.)

## CROSS EXAMINATION BY

MR. TAYLOR:

Q. Dr. Lejeune, I have just a very few questions. You testified earlier that in the case of freezing human embryos, the temperature is lowered only to, I think, a hundred and eighty or ninety degrees below centigrade, is that correct?

A. Yes, generally.

Q. And because that is not absolute zero there are still certain processes that continue within those embryos?

A. Very slowly.

Q. And because of that, it is your opinion that life or the processes are not suspended completely, and therefore the embryo continues to age or develop, is

46

that right?

A. No, it does not continue to develop, but it can age in the sense of losing some properties because of the agitation of the molecule and not being able to repair it. It's the reason why if you freeze cells, ordinary cells in tissue culture, and if you thaw them, after one month you will get ninety percent groove, after ten years you will get fifty percent, so eventually some of them have died in the process.

Q. Is it then your opinion if these embryos are left in this frozen condition indefinitely, ultimately they will perish?

A. If they were to be protected for a long time, I would put them in liquid hydrogen, but it will cost very much.

Q. If they're in liquid nitrogen which is not absolute zero, is it your opinion that they would ultimately perish?

A. I cannot tell time but ultimately.

Q. Is it your opinion that the ultimate effect of storage in cryopreservation ultimately would have the same effect as destroying them now?

A. In the ultimate, yes, but I dislike to speak about very long time because I'm not sure of what would happen in between.

Q. Yes, sir. You indicated that you do not object to in vitro fertilization as a process, do you?

A. I do not favor it for theoretical reasons. I guess it's a trick we use now in the present stage of knowledge, but it's not the best answer. If you read the newspaper it seems to be the last word about helping reproduction, and I guess it's a wrong idea. But that is a technical opinion.

Q. Even though it may not be the ultimate solution, the ideal solution, you would concede that many, many infertile couples have been helped by in vitro fertilization, would you not?

A. I would consider some have been helped, but the number that have been helped by other methods is much greater. But some have been helped, no doubt.

Q. Doctor, you indicated that one of the reasons you objected to cryopreservation was because there is a mortality rate, certain percentage of the embryo do not survive the process, is that correct?

A. It's not only that. That is one of the reasons, but it's not the only reason.

Q. Are you aware, Doctor, in a normal cycle, a natural reproductive cycle that as many as sixty percent of the ova produced by a mother undergo actual fertilization? Are you familiar with that particular statistic?

A. No, I don't understand what you mean.

Q. We have been told that as many as sixty percent of the eggs produced by a mother may be actually fertilized, but statistically only about twenty-five actually result in a birth.

A. You mean about the early death of early human beings. Well, it has been a very disputed field. To the best of our knowledge, we can rely on experimental animals because we can look at the number of yellow corpus which develops on

47

40

the ovary and tells us how many eggs have been laid and look at the litter, for example, in mice or any other animals. It seems that thirty percent of the conceptus die, but that more than sixty percent of conceptus come to birth and to normal-that has been established in many wild animals. Then it seems that the number of early deaths has been overestimated recently in our species. I would guess it around the order of thirty percent. Some of them said sixty percent—I would guess myself it's around closer to thirty than to sixty, but that is

Q. You do recognize

A. A sizable number.

Q. You do recognize, do you not, though, Doctor, that when a man and woman attempt to have a child by normal sexual intercourse, there is a percent of embryo human beings, in your terminology, that are created that never result in a birth; that is a risk they undergo?

A. It's difficult to answer your question because some of those fertilizations are probably abnormal fertilizations that can be early cysts and what we call empty cysts which are probably not really true fertilizations. It is very complex, but I agree with you that the road of life is dangerous, even at the very beginning.

Q. I guess my question is, Doctor, then even in natural intercourse trying to achieve a pregnancy, there are going to be some risks that some of the embryo will not survive just like in vitro fertilization?

A. Yeah.

Q. Finally, Doctor, as I understand your testimony here today, if you were advising his Honor on a solution to this very troublesome problem, your first preference would be that the embryo be returned to the mother, Mrs. Davis, in this case, is that correct?

A. I would go step by step, if you ask me. May I, your Honor?

THE COURT: Yes, you may.

THE WITNESS: I would first say it's not a property so they must not be destroyed. Secondly, they have been put into suspended time in the hope that some day they will be given shelter by their own mother, and their mother offers them shelter. I don't see any reason not to grant it to them and to her.

BY MR. TAYLOR:

Q. Let me take that one step further: If his Honor should decide for some reason that it is not appropriate that Mrs. Davis, the mother, should have these embryo, would you then agree that the second preference, the second best solution would be to donate them to some other couple, some other mother who would bring them into being, or attempt to bring them 'into being?

A. I would agree with that because that would preserve the life of the embryos, but then if you agree with that, you are coming back to the Solomon decision. The true mother is the one who prefer the baby given to another than the baby being killed. Then I would suppose that the justice would be on the

48

41

side of Solomon.

MR. TAYLOR: We all hope his Honor has the wisdom of Solomon. Thank you, Doctor.

THE COURT: Do you have anything?

MR. CHRISTENBERRY: No, thank you, your Honor.

THE COURT: Any recross?

MR. CLIFFORD: No, your Honor.

THE COURT: Dr. Lejeune, you may come down and have a seat over here with Mr. Palmer and Mr. Christenberry.

(The witness was excused.)

49

42

IN THE CIRCUIT COURT FOR BLOUNT COUNTY, TENNESSEE,
AT MARYVILLE,
EQUITY DIVISION (DIVISION I)

JUNIOR L. DAVIS,
    *plaintiff,*

vs.

MARY SUE DAVIS,
    *Defendant,*

vs.

RAY KING, M.D., d/b/a
    Fertility Center of East Tennessee,
    *Third Party Defendant.*

No. E-14496

## OPINION OF THE COURT

IN THIS DOMESTIC RELATIONS case, the only issue before the Court is the disposition of seven cryogenically frozen embryos maintained by the Third Party Defendant and the product of in vitro fertilization undertaken by the Plaintiff and the Defendant.

THE CASE is one of first impression.

IN ITS OPINION below, the Court has made certain findings of fact and conclusions of law resulting in judgment.

THE SALIENT findings, conclusions and the judgement are summarized as follows, to-wit:

(1) Mr. and Mrs. Davis undertook in vitro procedures for the purpose of producing a human being to be their child.

(2) The seven cryogenically preserved embryos are human embryos.

(3) American Fertility Society Guidelines are for intra-professional use, are not binding upon the Court, but are of probative value for consideration by the Court.

(4) The term "preembryo" is not an accepted term and serves as a false distinction between the developmental stages of a human embryo.

(5) From fertilization, the cells of a human embryo are differentiated, unique and specialized to the highest degree of distinction.

(6) Human embryos are not property.

(7) Human life begins at conception.

(8) Mr. and Mrs. Davis have produced human beings, in vitro, to be known as their child or children.

(9) For domestic relations purposes, no public policy prevents the continuing development of the common law as it applies to the seven human beings existing as embryos, in vitro, in this domestic relations case.

(10) The common law doctrine of *parens patriae* controls children, in vitro.

(11) It is to the manifest best interests of the child or children, in vitro, that they be available for implantation.

50

43

( 12) It serves the best interests of the child or children, in vitro, for their Mother, Mrs. Davis, to be permitted the opportunity to bring them to term through implantation.

JUDGMENT OF THE COURT: The temporary custody of the seven cryopreserved human embryos is vested in Mrs. Davis for the purpose of implantation. All issues of support, visitation, final custody and related issues are reserved to the Court for consideration and disposition at such time as one or more of the seven human embryos are the product of live birth.

## APPENDICES TO OPINION OF THE COURT

BECAUSE of much public interest in the case, Appendix A will assist the parties and the public to understand some fundamental rules and principles required to be applied the Court in the process of deciding the case. Appendix B is the Court's summary of the testimony given in the case over a period of almost three days (August 7, 1989, August 8, 1989 and August 10, 1989). Appendix C is footnote references to the Court's Findings of Fact and Conclusions of Law section of the Opinion.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### The Davises - Their Marriage

Based on the record before it, the Court finds that Mr. Davis is a gentleman; he is 30 years of age, employed as an electrician and a refrigeration technician by the Maryville Housing Authority, Maryville, Tennessee, earning about S17,500.00 annually. Mrs. Davis is a lady; she is 28 years of age who, at the trial, was employed by the Sea Ray Boat Company, Vonore, Tennessee, as a sales representative earning about $18,000.00 annually. Subsequent to the trial, Mrs. Davis has become domiciled in the state of Florida.[1]

### Infertility of Mrs. Davis

Mr. and Mrs. Davis have been married about nine years. They very much wanted to have a family, but after Mrs. Davis suffered five tubal pregnancies, her physician advised and she undertook surgical treatment which rendered her incapable of natural conception. The Court finds that Mrs. Davis suffered significant trauma and pain resulting from the parties' attempts to procure their family by way of natural childbirth. In vitro fertilization[2] is the only option now available to her to have her own child.

### In Vitro and Adoption Attempts

Remaining committed to having a family, Mr. and Mrs. Davis sought the advice and counsel of Dr. Ray King in the Fall, 1985, became familiar with and participated in the in vitro fertilization program under Dr. King's direction and guidance. Dr. King was assisted by his colleague, Dr. Charles A. Shivers, who performed the necessary laboratory work in connection with the in vitro fertilization program. In addition, Dr. King was assisted by his patient coordinator, Deborah Cooper McCarter, a Registered Nurse and Dr. King's administrative

assistant.

After some six attempts by the couple to produce a child through the in vitro fertilization process, resulting in no pregnancy, the parties temporarily suspended their participation in the program and sought to obtain a child through adoption. The adoption process did not work, and the parties abandoned adoption attempts and returned to the in vitro fertilization program conducted by Dr. King.

**Cryopreservation Technique**

In the Fall, 1988, Mrs. Davis learned of the new cryopreservation[3] program sponsored by King's clinic whereby several ova[4] could be aspirated[5], inseminated[6] in the laboratory and if the insemination process produced fertilized zygotes, the zygotes[7] could be allowed to mature in the laboratory to a medically accepted point for the purpose of either implantation[8] or cryopreservation for future implantation. Mrs. Davis discussed the new technique with her husband and armed with that information the parties proceeded to re-enter the program with the intent of producing a child or children which would constitute their family.

**Further In Vitro Attempts**

It is undisputed in the record and the Court finds that in order to prepare her reproductive system to produce quality ova for insemination, Mrs. Davis went through many painful, physically tiring, emotionally and mentally taxing procedures, both before the December, 1988 events and after those events. As a prospective Mother, she spent many hours of anxious moments waiting for word as to whether she would be a Mother. The cry(preservation technique offered Mrs. Davis much welcomed relief from the rigors of the full procedure each time in vitro fertilization was attempted.

It is further undisputed and the Court finds that Mr. Davis donated sperm for the December, 1988 insemination and resulting fertilization process, that he spent many anxious hours, early in the morning and late at night, waiting at the hospital while Mrs. Davis underwent the aspiration and implant procedures and that he spent many anxious hours, as a prospective Father, awaiting word as to whether he would be a Father.

On December 8, 1988, nine ova were aspirated from Mrs. Davis, nine ova were inseminated with Mr. Davis' sperm by Dr. Shivers in his laboratory and the nine ova were fertilized, producing acceptable zygotes for implantation consideration by Dr. King and Dr. Shivers, The zygotes were permitted to mature under laboratory conditions, variously developing from the four-cell cleavage[9] stage to the eight-cell cleavage stage, all of which were found to be of excellent quality by Dr. Shivers and Dr. King. On December 10, 1988, two of the embryos[10] were implanted in Mrs. Davis, neither of which resulted in pregnancy, and the remaining seven embryos were placed in cryogenic storage for future implantation purposes.

52

**Cryopreservation For Davis Family Only**

The Court finds that before their embryos were committed to cryogenic storage, Mr. and Mrs. Davis knew, were aware of and had discussed between themselves (and with at least Dr. Shivers) the fact that reliable medical data indicated the practical storage life of the human embryos would probably not exceed two years. Mr. and Mrs. Davis had discussed the fact that if Mrs. Davis became pregnant as a result of her implant on December 10, 1988, the possibility existed that the remaining seven embryos in cryopreservation could be donated to another infertile couple, but the parties made no decision about that matter.

The Court further finds that during the time between December, 1988 and the filing of the original Complaint in this case (February 23, 1989), Mr. and Mrs. Davis discussed the possibility of and had tentatively planned to implant at least one of the cryopreserved embryos in Mrs. Davis' body in March or April, 1989.

**The Intent of Mr. and Mrs. Davis**

The Court further finds that Dr. King and Dr. Shivers engaged in a concerted effort with the Davises to help Mr. and Mrs. Davis become parents, both as to the IVF procedures before and after the utilization of the cryopreservation technique; and the Court finds and concludes that Mr. and Mrs. Davis participated in the IVF program, both before and after the employment of the cryopreservation technique, for one purpose: to produce a human being to be known as their child.

**Issues for the Court**

There is no fact in the record to persuade the Court that Mr. and Mrs. Davis discussed or had any thought of changing their intent until the Complaint was filed in this case on February 23, 1989 and it must be determined from the proof whether Mr. and Mrs. Davis accomplished their intent. That determination is to be made by the answer to the most poignant question of the case: When does human life begin?

To answer this question, several additional questions must first be asked and answered, based on the record in this case: Are the embryos human? Does a difference exist between a preembryo[11] and an embryo? Are the embryos beings? Are the embryos property that may become human beings?

**Human Embryos- The Experts**

Of the eight witnesses who gave testimony in this case, five of the witnesses presented themselves possessing the requisite knowledge, special skill, experience and education necessary to establish themselves as experts[12] in their respective fields of professional endeavor.

Because of her special training as a Registered Nurse, Mrs. McCarter is an expert witness; Dr. King[13] is a Medical Doctor and is a well qualified specialist in the field of Infertility/Reproductive Endocrinology; Dr. Shivers[14] is a well qualified Embryologist and is experienced in the laboratory work necessary for in

53

vitro fertilization and cryogenic storage of human embryos; Professor Robertson[15] is an eminently qualified Professor of Law whose scholarly treatises, dealing primarily with non-coital reproduction, have served as the basis for consideration of many medical-legal subjects; and Dr. Jerome Lejeune[16] is an eminently qualified Medical Doctor, Doctor in Science, Professor of Fundamental Genetics and recognized throughout the world in his specialty, Human Genetics.

The expert witnesses (except Mrs. McCarter) offered opinions to assist the court in determining when human life begins. It should be noted that all four witnesses agree that the seven cryopreserved embryos are human: that is, "belonging or relating to man; characteristic of man . . ."[17]

The Court finds and concludes that the seven cryopreserved embryos are human.

### Preembryo vs. Embryo: Human Beings

Three of the experts, however, respectfully disagree with Dr. Lejeune that the human embryos are in "being;" that is, in "existence; conscious existence; as, things brought into being by generation..." or living, alive[18]. The three experts insist the entities are at a stage in development where they simply possess the potential for life.

In the analysis of the testimony offered on the point of whether or not the seven embryos are human beings, the Court believes it is helpful to even further condense the already summarized opinion testimony (Appendix B)[19] of each expert on the subject:

1. **Dr. Irving Ray King:** There is a first a one-cell gamete[20], a zygote (after the first cell divides), a preembryo (up to 14 days after fertilization) and finally an embryo (after 14 days and upon cell differentiation).

2. **Dr. Charles Alex Shivers:** A preembryo is a zygote up to 11-14 days and consists largely of undifferentiated cells; that after attachment to the uterus wall and the appearance of the primitive streak, the cells then become different; that is organs, organ systems, body parts and the like are formed. At the time of fertilization, genetic controls are "locked in forever" and control who the preembryo will later be, but, "...as far as we know...to my knowledge...there is no way to distinguish the cells [at the zygote stage]...[T]hey are the same [undifferentiated]..."

3. **Professor John A. Robertson:** A human preembryo is an entity composed of a group of undifferentiated cells which have no organs or nervous system. That at about 10-14 days, the preembryo attaches itself to the uteran wall, develops its primitive streak and life then commences. It is "...not clear..." that a human preembryo is a unique individual that simply because fertilization has occurred, the gamete contributors have not procreated[21].

4. **Dr. Jerome Lejeune:** Each human has a unique beginning which occurs at the moment of conception. Embryo: "...that youngest form of a being..."

Preembryo: there is no such word. There is no need for a subclass of the embryo to be called a preembryo, because there is nothing before the embryo—before an embryo there is only a sperm and an egg; when the egg is fertilized by the sperm the entity becomes a zygote—and when the zygote divides it is an embryo, When the first cell exists, all the "tricks of the trade" to build itself into an individual already exists. Shortly after fertilization at the three-cell stage, a "...tiny human being..." exists. When the ovum is fertilized by the sperm, the result is "...the most specialized cell under the sun...:"; specialized from the point of view that no other cell will ever have the same instructions in the life of the individual being created. No scientist has ever offered the opinion that an embryo is property. As soon as he has been conceived, a man is a man. New findings recited [Jeffrey's-DNA][22 23] definitely prove differentiation and that from the very beginning there exists an embryo.

Dr. King, Dr. Shivers and Professor Robertson rely at least to some degree on the report of the Ethics Committee of The American Fertility Society[24] in forming the basis of their opinions. Each makes a distinction between "embryo" and "preembryo" in conformity to the AFS guidelines.

The ethical considerations by the committee for the AFS were referred to in, cited and relied upon by the Brief[25] filed by Mr. Davis; testimony was given about the Committee and its work. Professor Robertson is a member of the Ethics Committee, Dr. King is a member of the American Fertility Society and various witnesses gave testimony indicating reliance on the pronouncements of the Committee.

The AFS guidelines were published by the Society in September, 1986 after the Committee's last deliberation on April 14, 1986 in Norfolk, Virginia.[26] The guidelines were promulgated by the committee pursuant to the charge of the Society's President by letter dated November 7, 1984,[27] requesting the committee to address ethical issues regarding reproduction and to disseminate the committee's knowledge of these positions on those matters.

In its report, the committee defined the term "preembryo," and prefaced its definitions section with the following language:

"In order to avoid confusion, the committee found it necessary to adopt certain definitions for the purposes of this document." [Emphasis supplied][28]

The Committee then defined the word preembryo this way:

"A preembryo is a product of gametic union from fertilization to the appearance of the embryonic axis. The preembryonic stage is considered to last until 14 days after fertilization. This definition is not intended to imply a moral evaluation of the preembryo."[29]

In reviewing the guidelines, it is of interest to call attention to several considerations set-forth in the report. One of those considerations is the recognition by the committee that there are several respected views relative to

55

48

the moral and legal status of a preembryo. The committee adopted this view:

"A third view one that is most widely held—takes an intermediate position between the other two. It holds that the preembryo deserves respect greater than accorded to human tissue but not the respect accorded to actual persons. The preembryo is due greater respect than any other human tissue because of its potential to become a person and because of its symbolic meaning for many people. Yet, it should not be treated as a person, because it has not yet developed the features of personhood, is not yet established as developmentally individual, and may never realize its biologic potential."[30]

Under the heading "Emerging Consensus On Preembryo Status," the following statement is made:

"The Ethics Advisory Board, for example, unanimously agreed in 1979 that "the human embryo [i.e., preembryo in this report] is entitled to profound respect, but this respect does not necessarily encompass the full legal and moral rights attributed to persons" (Ethics Advisory Board, 1979)." [Emphasis supplied.][31]

In the Committee's summary of points of special interest, the following is found:

"The Committee finds that the human preembryo is not a person but is entitled to respect because it has the potential to become a person. This view limits the circumstances in which a preembryo may be discarded or used in research…"[32]

The Court finds and concludes that the report of the Ethics Committee of the American Fertility Society constitutes guidelines for those professionals involved in the field of fertility treatment; as Professor Robertson testified, they constitute guidelines for these professionals to be primarily utilized for litigation purposes. In other words, they are the self-imposed standards one professional would testify must be met by another professional, for example, in a medical malpractice suit. The guidelines do not have the force and effect of the law but must be considered by this Court for whatever probative,[33] value they may possess.

The Court finds and concludes that the guidelines of the AFS do not serve as authority for this Court in making a determination of whether the seven human embryos in question are human beings, and concludes the term "preembryo" has arisen in this suit primarily because the AFS Committee chose that term to avoid the confusion for the purposes of its own guidelines. The Court has made a thorough search of encyclopedias and dictionaries of which the Court may take Judicial notice and the Court can nowhere find the word "preembryo" defined nor can the Court find even a reference to that term.

Careful scrutiny of the testimony and an exhibit at the trial gives the Court even greater assurance that the term "preembryo" serves as a false distinguishing

56

term in this case.

Exhibit 8, at the trial, are the handwritten notes of Dr. King. Dr. King's notes concerning the status of his patient, Mary Davis, covering the period of time from December 8, 1988 at 10:08 a.m. through and including December 10, 1988 at 3:31 p.m., all refer to the ova after fertilization as "embryo"; and the last document in that series of notes makes reference to the "condition of embryo" and variously describes the seven embryos as…4 cell embryo-perfect…"

The Court finds it curious that Dr. King, who adopts the AFS guideline definition of a "preembryo" to distinguish it from an "embryo" would in his own notes call them embryo(s).

Counsel for Mr. Davis furnished the Court a revised copy of Professor Robertson's paper[34] written recently by him (probably finished in July, 1989), dealing specifically with the case at bar. The solution Professor Robertson setforth in his paper is the same solution he offered through his testimony. He was asked about that opinion on direct examination by Counsel for Mr. Davis; he was cross-examined by Counsel for Mrs. Davis about his opinion cited therein. The paper is entitled *Resolving Disputes Over Disposition of Frozen Embryos*; from the title page through 31 additional pages (the entire text), Professor Robertson, speaking about the case at bar, referred time and again to the "embryos."

It is curious that this very scholarly paper does not reflect the very fine distinction between "preembryo" and "embryo" made by Professor Robertson throughout his testimony at the trial.

The Court is persuaded that the debate between these most sincere and knowledgeable witnesses perhaps boils down to much the same debate Sweet Juliet had with herself when she rationalized her strong affection for Romeo, who was not a Montague:

"…'Tis but thy name that is my enemy;
Thou art thyself, though not a Montague.
…What's in a name? that which we call a rose
By any other name would smell as sweet …"[35]

The Court finds and concludes there is no such term as "preembryo"; that to use the term in the context of this case creates a false distinction, one that does not exist. The Court finds and concludes the seven cryopreserved entities are human embryos.

## DNA Manipulation Verifies Uniqueness

Based on the analysis of the testimony comprising the positions of Dr. King, Dr. Shivers and Professor Robertson, it appears that where these gentlemen most sharply differ with Dr. Lejeune is in the area of cell differentiation. Dr. Lejeune, of course, gives emphatic testimony that the cells are especially differentiated and that such position is a proven scientific fact.

The term "differentiate,"[36] means to distinguish by a specific difference. If the cells, therefore, of a four cell zygote are undifferentiated, the cells lack any distinction, a skilled scientist could not distinguish the cells of one zygote from

57

those of another zygote nor could the scientist distinguish between any of four cells within the hypothetical zygote. Dr. Lejeune bases his emphatic opinion to the contrary (". . . the most specialized cell under the sun . . .") on a complicated scientific process of manipulating and reading the DNA molecule, characterized by him as new findings which definitely prove differentiation, now known through the science of molecular genetics[37] beyond any doubt.

The testimony given by Dr. Lejeune relative to conclusive proof induced through DNA examination is highly technical, incapable of observation by the Court and requires the Court to either accept or reject the scientist's conclusion that it can be done. While this factor requires the Court to proceed with special caution, it does not of itself render testimony or other evidence based on this highly specialized field of molecular genetics unreliable.[38]

Quite to the contrary, DNA profiling, through "genetic fingerprint" evidence by which strands of coating found in genetic molecule of deoxyribonuclei acid (DNA), has been accepted as competent and admissible evidence in Courts of law, is considered reliable, is performed by a number of laboratories around the world and is generally accepted in the scientific community.[39]

As indicated in footnote 39, the *Andrews* case was decided by the United States District Court of Appeals of Florida, Fifth District, on October 20, 1988 and review of the case was denied in 1989. It is the only case this Court has been able to find dealing with the reliability of the DNA procedures so forcefully relied on by Dr. Lejeune. *Andrews* approves the reliability of DNA profiling, a process very similar to the one described and relied on by Dr. Lejeune.

Both Dr. Shivers and Professor Robertson cite undifferentiated cells as one basis for their opinions that human embryos are not human beings, but each hedges on the point. Dr. Shivers says "as far as he knows" there 'is no way to distinguish the cells, that they are undifferentiated; and Professor Robertson says "it is not clear that a unique individual" then exists.

The testimony of Dr. Lejeune stands unrebutted in the record; the Court accepts his testimony that DNA manipulation of molecules of human chromosomes[40] reliably proves cell differentiation. The Court is persuaded that this relatively new technique opens a tiny window to the world to see and be aware of the most intimate and intricate details of man from his very beginning.

The Court finds and concludes that the cells of human embryos are comprised of differentiated cells, unique in character and specialized to the highest degree of distinction.

Dr. Shivers and Professor Robertson testified that the preembryo is not a being because he or she has no (observable) organs or nervous system, no body parts. Dr. Lejeune, on the other hand, says a man is a man; that upon fertilization, the entire constitution of the man is clearly, unequivocally spelled-out, including arms, legs, nervous systems and the like; that upon inspection via DNA manipulation, one can see the life codes for each of these otherwise unob-

58